Charles **EDWARDSEN, Jr.,** Individually and as Executive Director of the Arctic Slope Native Association, et al., Plaintiffs,

v.

Rogers **C. B. MORTON,** Secretary of the United States Department of the Interior, and his successors and predecessors in Office, et al., Defendants.

Civ. A. No. 2014–71.

United States District Court, District of Columbia.

April 19, 1973.

O. Yale Lewis, Seattle, Wash., admitted pro hac vice, for plaintiffs.

Herbert Pittle, Atty., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM-ORDER

GASCH, District Judge.

This case came on for consideration on the defendants' motion for summary judgment and the entire record herein. Plaintiffs are certain Native villages on the Arctic Slope (also termed the North Slope) of Alaska, the Arctic Slope Native Association, the Inupiat Community of the Arctic Slope, and certain individual Inupiat Eskimos living in the region concerned. Defendants are Rogers C. B. Morton, the Secretary of Interior (hereafter called "the Secretary") and three other Department of Interior officers responsible for public lands management or Indian affairs at the time this action was brought, namely, Louis R. Bruce, Commissioner, Bureau of Indian Affairs; Harrison Loesch, Assistant Secretary for Public Land Management; and Burton Silcock, Director, Bureau of Land Management. The successors and predecessors in office of the Secretary, Commissioner Bruce, and Assistant Secretary Loesch are also named as defendants.

The issues in this action are not susceptible of easy capsulization. At the risk of considerable oversimplification, plaintiffs' claims can be said to concern actions by defendants which allegedly violated plaintiffs' rights in Arctic Slope lands and waters by facilitating allegedly unlawful transfers of land to the State of Alaska and by issuing purported authorizations for third-party trespasses on the lands and waters in question. Plaintiffs have not moved for summary judgment because they properly believe issues of material fact must be resolved in their favor before the relief they request could be granted.

Defendants raise a number of defenses in their motion for summary judgment. Their principal defense is that plaintiffs never had rights of the kind alleged and even if they did, any suit based directly or indirectly on those as-

serted rights is barred by the Alaska Native Claims Settlement Act of 1971, 85 Stat. 688 (hereafter termed Settlement Act).

Interests of great importance are ultimately at stake in this action. Seen against the dark backdrop of this nation's often callous treatment of Native Americans, plaintiffs' claims are especially compelling. On the other hand, defendants rightly emphasize the desire of Congress to bring to an end a period of intolerable uncertainty about the potential impact of Native claims on land titles and mineral leases in Alaska.

## I. *Background.*

The legal issues are more easily grasped if the history out of which they have arisen is at least briefly sketched in. The Arctic Slope of Alaska where the Inupiat Eskimos live was occupied by their ancestors for many hundreds of years before them.[1] In this area they, like their ancestors, have sustained themselves by fishing, hunting, and trapping. When Alaska was acquired by the United States from Russia in 1867, the treaty, in unfortunate language, provided as follows:

> The inhabitants of the ceded territory, according to their choice, reserving their natural allegiance, may return to Russia within three years; but if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and shall be maintained and protected

in the free enjoyment of their liberty, property, and religion. The uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of that country.[2]

The United States, through Congress, did proceed to enact laws containing provisions that concerned the Alaskan Natives. Among other acts, it recognized the Natives' right not to be disturbed in the possession of lands they occupied until such time as Congress should act to extinguish their occupancy rights,[3] and it authorized the Secretary of Interior to issue deeds to Alaskan Natives for townsites under certain conditions.[4] However, no treaties were negotiated, and the creation of reservations, although authorized, was negligible. The lands involved in this action are not reservation lands.

In 1958, the admission of Alaska to the Union was accomplished by the enactment of the Alaska Statehood Act of July 7, 1958, 72 Stat. 339, as amended, 73 Stat. 141 (hereafter termed Statehood Act). The Statehood Act provided for selections by the State of over 100 million acres, to be chosen from public lands that were "vacant, unappropriated, and unreserved at the time of their selection."[5] Selections from public lands other than national forest lands required the approval of the Secretary of Interior, the officer with authority to patent such lands to the State.[6] Section 6(g) of the Act further provides: "Following the selection of lands by the State and the tentative approval of such

---

1. The area which plaintiffs claim that they and their ancestors have continuously used and occupied is described as follows: "[The Arctic Slope region] comprises a well-defined parcel of fifty-six and one-half million acres of land between the summit line of the Brooks Mountain Range and the shore of the Arctic Ocean, from north to south, and from the Canadian Border to Point Hope, from east to west." Amended Complaint, Paragraph III.

2. Treaty of March 30, 1867, Art. III, 15 Stat. 539, 542.

3. Organic Act of May 17, 1884, Sec. 8, 23 Stat. 24, 26.

4. Act of May 25, 1926, 44 Stat. 629, Part 2, ch. 379.

5. Sections 6(a) and 6(b) of the Statehood Act, 72 Stat. 339, 340.

6. Sections 6(a) and 6(g), 72 Stat. 339, 340–41.

selection by the Secretary of Interior or his designee, but prior to the issuance of final patent, the State is hereby authorized to execute conditional leases and to make conditional sales of such selected lands." [7] The Act also contained a provision, Section 4, which the legislative history indicates was intended to maintain the status quo as to Native property rights until Congress should act further on the matter. [8]

During the 1960's, the State made selections of large areas of land in, among other places, the Arctic Slope of Alaska, a region in which the existence of large oil deposits had been suspected. During this same period, protests from various Alaskan Native organizations were mounting in the face of State selections of land in which the Natives claimed rights they believed to be inconsistent with valid State selections. The proportion of the State land area affected by these protests was great. Thus, a report issued in 1968 by the Federal Field Committee for Development Planning in Alaska indicated that of 272 million acres in the public domain, Alaskan Natives had claimed title, based on continuous use and occupancy, to 250 million acres; and of 12 million acres "in the process of selection by State under

the terms of the Statehood Act," Alaskan Natives claimed all but 100,000 acres. [9] In the Arctic Slope Area, which is the subject of the action herein, exhibits filed by plaintiffs indicate that Native claims covered virtually the entire region. [10]

Partly in response to such protests, an informal land freeze was instituted by Secretary of Interior Udall late in 1966; issuances of mineral leases on federal lands and approvals or tentative approvals of State selections were suspended pending Congressional determination of Native land rights. [11] Large areas of land had been selected by the State before the freeze, however, and reports of oil deposits in one area selected—the Prudhoe Bay region on the Arctic Slope —were confirmed in 1968. The Secretary had given tentative approval to selections in this area, and the State moved quickly to exploit its good fortune, executing a sale of leases to oil companies in 1969 for a price in excess of 900 million dollars.

In the meantime there was a movement in Congress to enact legislation which would end the uncertainty about the nature and extent of Native rights in land already selected by the State and land which the State might wish to se-

---

7. 72 Stat. 339, 342.

8. 72 Stat. 339.

9. Alaskan Natives and the Land, 536 (GPO, 1968). The Field Committee was commissioned by Senator Jackson, Chairman of the Senate Interior and Insular Affairs Committee, to study the Native claims problem. The report just cited is a part of the legislative history of the Settlement Act, S.Rep. No. 92–405, 92d Cong., 1st Sess. 73–74 (1971).

10. Copies of letters of protest filed in 1966 by an attorney, William Paul, on behalf of Arctic Slope Natives and of a letter dated April 7, 1966, from defendant Burton W. Silcock, Director of the Bureau of Land Management, to the BLM director for Alaska, are attached as exhibits to the Amended Complaint.

11. The freeze was made official in Public Land Order No. 4582, issued January 17, 1969, which reads as follows:

Subject to valid existing rights, and subject to the conditions hereinafter set forth, all public lands in Alaska which are unreserved or which would otherwise become unreserved prior to the expiration of this order, are hereby withdrawn from all forms of appropriation and disposition under the public land laws (except locations for metalliferous minerals), including selection by the State of Alaska pursuant to the Alaska Statehood Act (72 Stat. 339), and from leasing under the Mineral Leasing Act of February 25, 1920 (41 Stat. 437; 30 U.S.C. 181 et seq.), as amended, and reserved under the jurisdiction of the Secretary of the Interior for the determination and protection of the rights of the Native Aleuts, Eskimos, and Indians of Alaska. The withdrawal and reservation created by this order shall expire at 12 p. m. (midnight), prevailing A. s. t., December 31, 1970.

lect upon the termination of the freeze. Finally, in 1971, in order to provide "a fair, just, and final settlement of all land claims of Alaskan Natives, Native villages, and groups," Congress passed the Settlement Act.[12] As will be apparent from the discussion below of the legal issues, defendants believe that this Act effectively bars all of plaintiffs' claims; and plaintiffs contend not only that the Act does not bar their claims but that it enables them to select large sections of the oil-rich lands on the Arctic Slope which had previously been transferred to Alaska.[13]

## II. *Plaintiffs' Claims.*

Plaintiffs' claims fall into two main categories: (1) challenges to the validity of certain titles to land and interests in leasable minerals, which allegedly rest on unlawful acts by the defendants; and (2) claims for compensation for alleged trespasses by third parties who, it is asserted, entered plaintiffs' lands under color of the allegedly invalid titles or of permits, licenses, and the like unlawfully issued by defendants. As subsequent discussion will reveal, defendants' summary judgment motion is sufficient to defeat some, but not all, of plaintiffs' claims. For that reason it is necessary to review the claims in some detail. To clarify the theories of the Amended Complaint, the Court will, in the following discussion, be drawing on plaintiffs' brief in opposition to the defendants' motion.

It is necessary at the outset to define Native land rights as plaintiffs see them before reviewing plaintiffs' theories regarding the ways in which defendants have allegedly violated these rights. Plaintiffs claim that by ancient authority Native Americans have enjoyed exclusive possessory rights in their aboriginal lands even after the European conquest of America. Plaintiffs cite the early cases of Johnson v. McIntosh, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823), and Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), and a long succession of later cases as demonstrating that these rights—sometimes referred to as "aboriginal title" or "Indian title"—are based simply on continued use and occupancy of lands, and can be extinguished only by Congressional action. Plaintiffs contend further that even though aboriginal title does not, in their view, depend on Congressional recognition for its validity, Cramer v. United States, 261 U.S. 219, 229, 43 S.Ct. 342, 67 L.Ed. 622 (1923), such recognition does exist in the case of the Arctic Slope lands they have claimed. One of the alleged manifestations of Congressional recognition is Section 8 of the Organic Act of May 17, 1884, 23 Stat. 24, 26, which provides:

> That the said district of Alaska is hereby created a land district, and a United States land-office for said district is hereby located at Sitka. . . . [T]he Indians or other persons in .said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress.

Another Congressional enactment which plaintiffs see as recognition of the

---

12. Plaintiffs believe the terms of this Act to be unfair to them unless the Act is interpreted to allow them to choose from certain lands previously selected by Alaska. Whether or not the Court agrees with them on the relative fairness of the Act is, however, immaterial since the settlement incorporated in the Act represents a political judgment with which this Court may not interfere. Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 291, 75 S.Ct. 313, 99 L.Ed. 314 (1955); United States as Guardian of the Hualpai

Indians of Arizona v. Santa Fe Pacific Railroad Co., 314 U.S. 339, 347, 62 S.Ct. 248, 86 L.Ed. 260 (1941).

13. This claim based on the Settlement Act itself was not made in plaintiffs' Amended Complaint so it is not discussed in the following section setting forth plaintiffs' claims. It was first raised in plaintiffs' opposition to defendants' motion for summary judgment, and is more in the nature of an asserted consequence of plaintiffs' claims, if successful.

rights they claim is Section 27 of the Act of June 6, 1900, 31 Stat. 321, 330, which provides: "The Indians or persons conducting schools or missions in the district shall not be disturbed in the possession of any lands now actually in their use or occupation. . . ." However, the act of alleged Congressional recognition on which plaintiffs place the most weight is Section 4 of the Statehood Act, which, as amended in 1959, 73 Stat. 141, reads:

> SEC. 4. As a compact with the United States said State and its people do agree and declare that they forever disclaim all right and title to any lands or other property not granted or confirmed to the State or its political subdivisions by or under the authority of this Act, the right or title to which is held by the United States or is subject to disposition by the United States, and to any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts (hereinafter called natives) or is held by the United States in trust for said natives; that all such lands or other property (including fishing rights), the right or title to which may be held by said natives or is held by the United States in trust for said natives, shall be and remain under the absolute jurisdiction and control of the United States until disposed of under its authority except to such extent as the Congress has prescribed or may hereafter prescribe, and except when held by individual natives in fee without restrictions on alienation: *Provided,* That nothing contained in this Act shall recognize, deny, enlarge, impair, or otherwise affect any claim against the United States, and any such claim shall be governed by the laws of the United States applicable thereto; and nothing in this Act is intended or shall be construed as a finding, interpretation, or construction by the Congress that any law applicable thereto authorizes, establishes, recognizes, or confirms the validity or invalidity of any such claim, and the determination of the applicability or effect of any law to any such claim shall be unaffected by anything in this Act: *And provided further,* That no taxes shall be imposed by said State upon any lands or other property now owned or hereafter acquired by the United States or which, as hereinabove set forth, may belong to said natives, except to such extent as the Congress has prescribed or may hereafter prescribe, and except when held by individual natives in fee without restrictions on alienation.[14]

These rights which plaintiffs contend are based on use and occupancy and strengthened by Congressional recognition are said to include the right to exclude all parties except those whose entry is authorized by Congress and the ownership of a beneficial interest in all exploitable resources such as timber and minerals. On the latter point they cite United States v. Shoshone Tribe, 304 U. S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938), and The Tlingit and Haida Indians of Alaska v. United States, 389 F.2d 778, 182 Ct.Cl. 130 (1968).

Given the existence of these rights, plaintiffs assert that title to the land selections made by Alaska, pursuant to the Statehood Act, in the Arctic Slope region never rightfully passed, even provisionally, to the State. According to Section 6 of the Act, such selections could be made only from lands that were "vacant, unappropriated, and unreserved at the time of their selection," and the Secretary of Interior could give his ap-

---

14. In the section as originally enacted, the "absolute jurisdiction and control" provision appeared to apply to lands held by the United States in its own right as well as to those held by or in trust for the natives. The language was changed to take lands held by the United States which were free of native claims out from under the provision. The change was made at the instance of the Bureau of the Budget. See letter of March 24, 1959, from Maurice Stans, Budget Director, to Richard M. Nixon, President of the Senate, printed in S.Rep.No. 331, 86th Cong., 1st Sess., 24–26 (1959).

proval only to selections meeting these criteria. Insofar as the Secretary tentatively approved selections of lands in which plaintiffs possessed rights based on aboriginal title, such approvals were void *ab initio*, plaintiffs assert. Moreover, they contend, the oil leases sold by Alaska on Arctic Slope lands at a price of approximately 912 million dollars were similarly void because, under Section 6(g) of the Statehood Act, tentative approval by the Secretary of the selections of land on which leases were conditionally sold, was a prerequisite for the sales.

In addition, plaintiffs allege that all tentative approvals by the Secretary of Arctic Slope selections violated the Secretary's fiduciary duty to protect the interests of Native Americans, whose welfare is a federal trust responsibility,[15] and that the approvals violated certain Department of Interior regulations. In particular, it is alleged that the Secretary violated the following regulations: 43 C.F.R. § 2091.6–3 (1972), providing that "Lands occupied by Indians, Aleuts, and Eskimos in good faith are not subject to entry or appropriation by others";[16] and 43 C.F.R. § 2091.5 providing that

> Managers will ascertain by any means in their power whether any public lands in their districts are occupied by Indians and the location of their improvements, and will suspend all applications made by others than the Indian occupants, upon lands in the possession of Indians who have made improvements of any value whatever thereon.

Finally, it is claimed that the Secretary's tentative approvals were void because they were granted in violation of plaintiffs' rights to due process under the Administrative Procedure Act, 5 U.S.C. §§ 551–559 (1967), and the Fifth Amendment. In particular it is asserted that they did not receive adequate notice of the approval proceedings, an adequate opportunity to make their claims known, or an opportunity to be represented by counsel at a fair hearing, even though the approvals affected interests of great importance to them.

In making their claims arising from alleged trespasses on their lands, plaintiffs challenge not only the tentative approvals of land selections and leases sold thereunder but also various land use permits, licenses, and other authorizations issued by the Secretary or other defendants which, plaintiffs assert, purported to authorize the entry of third parties on lands and waters used or occupied by plaintiffs. Specifically it is alleged that the issuance of such authorizations to oil companies, construction companies, and others led to "acts of waste, trespass, and destruction" on plaintiffs' lands, including takings of gravel, desecration of graveyards where plaintiffs' ancestors lay buried, and reduction of plaintiffs' annual whale catch. (The damage to the whale catch was allegedly inflicted in 1970, when certain third parties, acting under licenses granted by the Department of Interior, conducted onshore and offshore seismic blasting in the vicinity of Icy Cape and Wainwright Village.)

---

15. Plaintiffs cite Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831), as the "classic expression" of the government's duty to Indian tribes, and they argue that Alaskan Natives are owed this duty also by virtue of "[a] course of executive dealings and congressional enactments," including the Organic Act of May 17, 1884, 23 Stat. 24, and the Act of June 6, 1900, 31 Stat. 321. Cases cited as recognizing this duty to Alaskan Natives include Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918), and Territory of Alaska v. Annette Island Packing Co., 289 F.

671 (9th Cir. 1923), cert. denied 263 U.S. 708, 44 S.Ct. 36, 68 L.Ed. 517 (1923). Plaintiffs also cite authority for the proposition that "the most exacting fiduciary standards" must be used in scrutinizing federal management of Indian property. Seminole Nation v. United States, 316 U.S. 286, 297, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942) ; Navaho Tribe v. United States, 364 F.2d 320, 176 Ct.Cl. 502 (1966).

16. Plaintiffs note that this regulation has existed in its present form since December 15, 1958.

In their prayer for relief for all of the unlawful activities alleged in the Amended Complaint, plaintiffs ask that this Court declare void all selections by Alaska in the North Slope region and all tentative approvals of such selections on the ground that they violate the various statutes, regulations, and duties listed in the Amended Complaint. They further seek a judgment declaring void "all rights, interests, leases, permits, or permissive occupancies issued in the North Slope region to any party by the Secretary of the Interior or by any other person under his jurisdiction." Prospective relief is also sought; plaintiffs ask that the Court enjoin the Secretary "from issuing any patents or further leases or permits on any North Slope lands" and "from granting tentative approval to any land selections by the State of Alaska in the Arctic Slope region." Plaintiffs also ask that the Court order the Secretary of Interior, "as trustee and guardian of plaintiffs" "to cause an accounting to be made and a money judgment to be paid plaintiffs for all monies received by the State of Alaska and other third persons" as a result of the allegedly unlawful approvals of State selections. For the acts of waste and trespass alleged, plaintiffs seek a money judgment. Finally, such other relief as this Court deems proper is requested.

### III. *Defendants' Motion for Summary Judgment.*

Although they dispute plaintiffs' contentions that Alaskan Natives ever had any "recognized" legal interest in the lands claimed in the Arctic Slope region, defendants' principal defense is that the Settlement Act bars all claims raised in this action, and that the Supreme Court opinion in Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955), is authority for the constitutionality of such action by Congress.

Defendants assert that the Settlement Act was intended by Congress to settle the conflicts generated by the filing of protests against State land selections and that successful maintenance of this action by plaintiffs would defeat that purpose. Specifically, they cite Section 4 of the Act, 85 Stat. 688, 689–90, as conclusively extinguishing all claims asserted in the present action. Section 4 provides as follows:

SEC. 4.(a) All prior conveyances of public land and water areas in Alaska, or any interest therein, pursuant to Federal law, and all tentative approvals pursuant to section 6(g) of the Alaska Statehood Act, shall be regarded as an extinguishment of the aboriginal title thereto, if any.

(b) All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist, are hereby extinguished.

(c) All claims against the United States, the State, and all other persons that are based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska, or that are based on any statute or treaty of the United States relating to Native use and occupancy, or that are based on the laws of any other nation, including any such claims that are pending before any Federal or state court or the Indian Claims Commission, are hereby extinguished.

Defendants point to Section 4(a) as a conclusive refutation of plaintiffs' claims that the Secretary's tentative approvals of State land selections in the North Slope area are void. They contend further that the sweeping language of Section 4(c) effectively extinguishes all claims in this action because all such claims are "based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska."

Such extinction of plaintiffs' claims violates none of their Constitutional rights, defendants further contend, because the Supreme Court has held that the right of Alaskan Indians in land

claimed on the basis of aboriginal title, i. e., use and occupancy, is merely "a right of occupancy which the sovereign grants and protects against intrusion by third parties but which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians." *Tee-Hit-Ton Indians*, 348 U.S. at 279, 75 S. Ct. at 317. Defendants assert that nevertheless the Settlement Act makes "generous provision" in the form of money, mineral royalties, and fee simple title to land in certain designated regions for all Alaskan Natives, including plaintiffs.[17]

In addition to their contentions based on the Settlement Act, defendants also raise the defenses of failure to exhaust administrative remedies, laches, the absence of indispensable parties, sovereign immunity, and lack of subject matter jurisdiction. In raising the defense of laches, defendants ask that this Court take judicial notice of an affidavit filed in Native Village of Allakaket et al. v. Hickel, Civil Action No. 706–70 in this Court,[18] which shows that, beginning in 1968, "numerous third parties," acting under permits issued by defendants have spent large sums of money on surveying and construction on lands in which plaintiffs are claiming superior rights. These activities were well known, defendants contend, and plaintiffs are thus estopped from maintaining this action, having "waited too long in these circumstances."

In contending that this Court lacks jurisdiction to grant the relief requested by plaintiffs because of the absence of indispensable parties, defendants ask that judicial notice be taken of the pleadings in certain other cases filed in this Court.[19] They assert that those pleadings show that both the State of Alaska and the Alyeska Pipeline Service Co. (successor to various oil companies which had received special land use permits from defendants) assert rights in the lands claimed by plaintiffs in this action; hence, defendants argue, the Court cannot grant the requested relief in this action without prejudicing the interests of these absent parties.[20]

In raising their sovereign immunity defense, defendants contend that, although this suit is ostensibly against certain officers in the Department of Interior, the relief requested would in effect be charged against the United States, which, defendants allege, has not consented to this suit. They point out that plaintiffs' prayer asks that certain land now owned by the United States be recognized as belonging to them and that a money judgment be awarded which would be a charge on the United States treasury. As authority for the proposition that such a suit cannot be maintained, defendants cite Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L. Ed.2d 15 (1963); Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); and Mine Safety Appliances Co. v. Forrestal, 326 U.S. 371, 66 S.Ct. 219, 90 L.Ed. 140 (1945). Defendants also point out that the Settlement Act itself cannot be taken as giving consent to the

17. As previously indicated, note 12, *supra*, the Court lacks jurisdiction to inquire into the fairness of the settlement.

18. Affidavit of Edgar W. Wellbaum, Vice-President of B. P. Alaska, Inc. A copy is attached as Exhibit A to defendants' motion for summary judgment.

19. These cases are Wilderness Society, et al. v. Hickel, D.C., 325 F.Supp. 422, and Cordova District Fisheries Union v. Morton et al., Civil Action No. 861–71. Copies of the pleadings are attached to defendants' motion as Exhibits B through I.

20. The cases cited in Note 19 were consolidated for trial, and the District Court Judge dissolved preliminary injunctions enjoining the Secretary of Interior from granting such permits, denied permanent injunctions, and dismissed the complaints. On appeal it was held that permits granting a right-of-way in excess of 54 feet for pipe-line construction purposes were void under the Mineral Leasing Act of 1920, 30 U.S.C. § 185 (1970). Wilderness Society et al. v. Morton et al., 156 U.S.App.D.C. 121, 479 F.2d 842 (February 9, 1973).

**1370**

action herein because Section 2(f) of that Act states:

> [N]o provision of this Act shall be construed to constitute a jurisdictional act, to confer jurisdiction to sue, nor to grant implied consent to Natives to sue the United States or any of its officers with respect to the claims extinguished by the operation of this Act.
>
> . . .

In none of the grounds for their motion do the defendants distinguish between plaintiffs' direct challenges to title and their claims based on alleged trespasses.

## IV. Issues Presented.

Resolution of the issues raised by defendants' motion and plaintiffs' opposition thereto requires (1) an examination of the nature of Alaskan Native land rights based on use and occupancy; (2) analysis of key provisions of the Statehood Act to determine its effect, if any, on those rights and the validity of the challenged approvals prior to passage of the Settlement Act; (3) a review of defendants' fiduciary duties to protect plaintiffs, applicable administrative regulations, and due process guarantees; (4) a determination of the effect of the Settlement Act on plaintiffs' claims; (5) consideration of Fifth Amendment constraints on the power of Congress to extinguish plaintiffs' claims; and (6) a determination of the merits of defendants' defenses of failure to exhaust administrative remedies, laches, absence of indispensable parties, sovereign immuni-

ty, and lack of subject matter jurisdiction.

## V. Nature of Plaintiffs' Possessory Rights.

To determine the nature of plaintiffs' possessory rights in the lands claimed by them, the Court must look primarily to the case of Tee-Hit-Ton Indians v. United States, supra, the most recent pronouncement by the Supreme Court on the rights of Alaskan Natives in lands claimed on the basis of long-term use and occupancy.[21] Tee-Hit-Ton concerned the right, if any, of the Tee-Hit-Ton Indians to compensation by the United States for timber taken from lands claimed by the Indians on the basis of the same kind of use and occupancy as alleged by plaintiffs herein. (The timber was sold by the Secretary of Agriculture under statutory authorization to negotiate contracts for such sales.) As in the instant case, Section 8 of the Organic Act for Alaska of May 17, 1884, 23 Stat. 24, 26, and Section 27 of the Act of June 6, 1900, 31 Stat. 321, 330, were cited as constituting Congressional recognition of Alaskan Native land rights. The Court held that what the Tee-Hit-Ton Indians had was "original Indian title," which "means mere possession not specifically recognized as ownership by Congress." 348 U.S. at 279, 75 S.Ct. at 317. (The Court had found that neither of the Congressional acts cited by the plaintiff Indians constituted recognition of ownership.) Moreover, the possession enjoyed by the Indians

21. In their contentions regarding rights based on use and occupancy, or aboriginal title, plaintiffs seek to rely in part on United States v. Alcea Band of Tillamooks, 329 U.S. 40, 67 S.Ct. 167, 91 L.Ed. 29 (1946), the so-called "First Tillamooks decision." There the Supreme Court held that the plaintiff Indians should be compensated for land held by "original Indian title" which was taken from them by the government. However, in United States v. Alcea Band of Tillamooks, 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 (1951) (the "Second Tillamooks decision"), in which the Court held that no interest should be paid on the amount of compensation awarded, it was specifically noted that

the recovery ordered in the earlier decision was *not* "grounded on a taking under the Fifth Amendment." 341 U.S. at 49, 71 S.Ct. at 553. In Tee-Hit-Ton, the Court reaffirmed this interpretation of the earlier decision, noting that compensation to the Tillamooks was based "upon statutory direction to pay for the aboriginal title in the special jurisdictional act to equalize the Tillamooks with the neighboring tribes . . . ." 348 U.S. at 284, 75 S.Ct. at 319. This Court cannot substitute its judgment for that of the Supreme Court in determining how the "First Tillamooks" decision should be read.

was held to be subject entirely to the will of the sovereign:

> This is not a property right but amounts to a right of occupancy which the sovereign grants and protects against intrusion by third parties but which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians. 348 U.S. at 279, 75 S.Ct. at 317.

> \* \* \* \* \* \*

> . . . Indian occupation of land without government recognition of ownership creates no rights against taking or extinction by the United States protected by the Fifth Amendment or any other principle of law. 348 U.S. at 285, 75 S.Ct. at 320.

■ However, although Native possessory rights are thus vulnerable to uncompensated extinction, it is clear from the opinion in *Tee-Hit-Ton* and earlier relevant cases that *only Congress* may extinguish such rights. 348 U.S. at 281, 75 S.Ct. 313; United States as Guardian of the Hualpai Indians of Arizona v. Santa Fe Pacific Railroad Co. (hereafter cited Walapai Tribe), 314 U.S. 339, 351, 62 S.Ct. 248, 86 L.Ed. 260 (1941); Cramer v. United States, 261 U.S. 219, 234, 43 S.Ct. 342, 67 L.Ed. 622 (1923). Until Congress acts to extinguish them, these rights to occupancy safeguarded from intrusion by third parties remain intact as an encumbrance on the fee (*Walapai Tribe*, at 347, 62 S.Ct. 248); and until an authorized transfer of title takes place, the fee remains in the United States. Tee-Hit-Ton Indians v. United States, 348 U.S. at 279, 75 S.Ct. 313; Buttz v. Northern Pacific Railroad, 119 U.S. 55, 66, 7 S.Ct. 100, 30 L.Ed. 330

(1886); Beecher v. Wetherby, 95 U.S. (5 Otto) 517, 525, 24 L.Ed. 440 (1877).

■ Thus, until Congress has acted to extinguish Native title in land claimed on the basis of use and occupancy, any third parties coming onto the land without consent of those rightfully in possession are mere trespassers. This status is unaffected by any mistaken belief on the part of the intruders that they are entitled to enter the land, so long as such a belief is not induced by those in possession of the land. Restatement of Torts 2d, § 164 (1965). Neither can such intruders escape liability by asserting that officers of the United States gave them permission, so long as those officers lacked the necessary statutory authority. Cramer v. United States, 261 U.S. 219, 234, 43 S.Ct. 342, 67 L.Ed. 622 (1923). Indeed, the officers are themselves liable in trespass if their actions caused third parties to enter the land. Restatement of Torts 2d, § 158, comment j at 279 (1965). But resort to that principle of tort law actually is unncessary in view of the fiduciary duty of the federal government and its agents to protect the interests of Native Americans.[22]

■ Although it is premature at this stage of the instant case to determine what would be the proper measure of damages where trespass allegations such as those made by plaintiffs are proven, two points should be made. The *Tee-Hit-Ton* Court's characterization of Native rights as being those of "mere possession" as opposed to "ownership" should not preclude Natives from maintaining an ordinary tort action for trespass to land and suing for the recovery of, *inter alia*, the value of any resources actually extracted from Native lands by trespassing third parties.[23] The *Tee-*

---

22. See discussion in Section VII below.

23. The standard damages rule in actions for trespass to land permits recovery for any physical harm done to the possessors of the land, the land itself, and anything thereon. Even when no physical harm is done, nominal damages at least are recoverable. In some cases, punitive damages can be award-

ed in addition to compensatory or nominal damages. Restatement of Torts 2d, §§ 162–63 (1965). The Court is, of course, aware of the fact that Native use and occupancy rights are in some respects *sui generis*, and cannot always be fully accommodated within the traditional structure of common law doctrine in the areas of tort and real

*Hit-Ton* Court did, it is true, retreat from the sweeping language of some earlier cases, notably *Walapai Tribe, supra,*[24] but nothing in *Tee-Hit-Ton* suggests that Natives could not recover for actual extraction of, e. g., sand and gravel, from their lands by unauthorized third parties even if the United States can be said to hold the title to all realty, including minerals in place. Such extraction would clearly involve a physical invasion of lands and would thus violate Native rights to undisturbed use and occupancy.

■■ On the other hand, the *Tee-Hit-Ton* Court cited Johnson v. McIntosh, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823), for the proposition that Na-

tives holding land on the basis of aboriginal use and occupancy have no *alienable* interest in such land. 348 U.S. at 279–280, 75 S.Ct. 313. Thus such Natives could not themselves sell interests in the land or its resources to third parties,[25] and it does not appear, therefore, that they could have any legal interest in money received for the sale of *property rights* such as mineral leases.[26] Native possessory rights as defined by the *Tee-Hit-Ton* Court guarantee the occupants protection from intrusions rather than a share in vendable interests in the lands. As will be apparent from the discussion in Section VIII below, the claims which survive the defendants' motion for summary judgment herein all relate to tres-

property. However, if the protection against intrusion which the *Tee-Hit-Ton* Court recognizes is to mean anything, it surely must mean that Natives have the right to prevent their lands from being mined or otherwise wasted by unauthorized third parties and to recover damages if such waste occurs.

24. In *Walapai Tribe,* the Supreme Court allowed the United States, as guardian of the Walapai Indians, to seek on their behalf an accounting for "rents, issues, and profits" derived from leasing and use of lands which had been claimed and entered by the Santa Fe Pacific Railroad Co., 314 U.S. 339, 344, 360, 62 S.Ct. 248, 86 L.Ed. 260 (1941). The Court made no real distinction between ownership and possessory rights, and clearly took a broader view of use and occupancy rights than did the *Tee-Hit-Ton* Court, which held that the Indian right of use and occupancy was "not a property right." It should perhaps be noted that, although the Court in *Walapai Tribe* stated that Indian occupancy rights as it defined them required no recognition by statute or treaty, the accounting was ordered only as to lands within a reservation, the Court having determined that the Walapais had relinquished claims to other aboriginal lands by moving onto the reservation. 314 U.S. at 357–358, 62 S.Ct. 248.

25. See, e. g., United States v. Cook, 86 U.S. (19 Wall.) 591, 22 L.Ed. 210 (1873), in which it was held that when certain Indians of the Oneida tribe cut timber standing on lands "held as other Indian lands are held," and sold the logs to one Cook, the United States, as owner of the fee, could recover the logs from Cook in an action for replevin.

Chief Justice Waite, speaking for a unanimous Court, observed: "The timber while standing is a part of the realty, and it can only be sold as the land could be. The land cannot be sold by the Indians, and consequently the timber, until rightfully severed cannot be. It can be rightfully severed for the purpose of improving the land, or the better adapting it to convenient occupation, but for no other purpose." 86 U.S. at 593.

26. Two cases are cited by plaintiffs for the proposition that Indian possessory rights include "every element of value that would accrue to a non-Indian land owner," but neither is on point to the instant case. In The Tlingit and Haida Indians of Alaska v. United States, 389 F.2d 778, 182 Ct.Cl. 130 (1968), the Court of Claims allowed the plaintiffs to recover the value of their land taken by the United States according to "the same standard of valuation" which would be used had the land been held by "fee simple ownership." 389 F.2d at 782. However, the *Tlingit* suit was brought under a special jurisdictional statute which permitted the plaintiffs to sue for the taking of their lands by the United States. The other case relied on by plaintiffs herein (and by the *Tlingit* Court) is United States v. Shoshone Tribe, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938). There the Supreme Court was construing a treaty in which the United States had agreed to set aside a particular area for a reservation. The Court noted: "The treaty, though made with knowledge that there were mineral deposits and standing timber in the reservation, contains nothing to suggest that the United States intended to *retain for itself* any beneficial interest in them" (emphasis added). 304 U.S. at 117, 58 S.Ct. at 798.

passes, i. e., unauthorized physical intrusions, occurring before passage of the Settlement Act in 1971 and not to interests in property rights transferred or sold in the lands involved.

To summarize the discussion in this section, it appears that, leaving aside for the moment the effect of the Statehood Act and the Settlement Act on plaintiffs' claims, plaintiffs' rights based on aboriginal title are rights to undisturbed use and occupancy. These rights entitle the holders to protection against all manner of physical intrusions into their lands, but they do not include ownership of alienable interests in exploitable resources such as oil and gas. These use and occupancy rights can be extinguished only by the United States acting through Congress, and until they are thus extinguished they remain as an encumbrance on the fee regardless of who holds it. Congress may also, of course, act to expand Native rights beyond those enjoyed on the basis of use and occupancy alone. To determine what Congress has done in the crucial pieces of legislation bearing on this action, the Court will turn next to an examination of the Statehood Act.

VI. *The Statehood Act.*

The key provisions of the Statehood Act, Sections 4 and 6, have been set out above in pertinent part.[27] The first question to be answered is whether Section 4 granted plaintiffs and others similarly situated rights beyond those based on aboriginal title as defined in Tee-Hit-Ton Indians v. United States, *supra.* In Section 4, Alaska, in a compact with the United States, agrees to "disclaim any right or title" in lands held by the Natives or held in trust for them by the United States. It is clear from the language of the first proviso of Section 4 and from explanations of that language in the relevant House and Senate reports that Congress did not in-

tend by this section either to enlarge or to diminish Native possessory rights existing at the time the Statehood Act was passed. Both reports note that the question of Native claims is to be left in "status quo" for future legislative or judicial determination.[28] Thus the rights of plaintiffs or other Natives claiming lands on the basis of aboriginal title remained those rights of occupancy described in *Tee-Hit-Ton.*

The next question is whether, despite the preservation of Native possessory rights provided for in Section 4, Alaska was free, under Sections 6(a) and 6(b), to select lands in which such rights existed, and whether the Secretary of Interior could properly grant tentative approval to the selections so as to permit the State to negotiate conditional sales and leases as provided for in Section 6(g). Resolution of this question requires the Court to determine whether lands in which Natives had possessory rights were "vacant, unappropriated, and unreserved," since the State was restricted to such lands in making its selections.

The Court cannot rest on the plain meaning argument advanced by plaintiffs in determining what is meant by "vacant, unappropriated, and unreserved," since as the Court of Appeals for this circuit recently observed:

On occasion we have paid lip service to the rule that where the language of a statute is clear and unambiguous on its face it cannot be controverted by seeking to show inconsistent legislative intent *see* Sea-Land Service, Inc. v. F.M.C., 131 U.S.App.D.C. 246, 250, 404 F.2d 824, 828 (1968), but we have also faced up to the reality that "the 'plain meaning' doctrine has always been subservient to a truly discernible legislative purpose however discerned," District of Columbia v. Orle-

27. See pertinent parts of Section 6 quoted, *supra,* p. 4; Section 4 is set forth, *supra,* pp. 9–10.

28. *See* S.Rep.No.1163, 85th Cong., 1st Sess. 15 (1957); H.R.Rep.No.624, 85th Cong., 1st Sess. 2 (1957).

ans, 132 U.S.App.D.C. 139, 141, 406 F.2d 957, 959 (1968).[29]

However, the legislative history of Sections 4 and 6 of the Statehood Act suggests that plaintiffs are correct in their contention that land which Natives possessed on the basis of use and occupancy could not be "vacant, unappropriated, and unreserved," so as to make it available for State selection under the Act. It is true that Congress apparently did not anticipate the filing of Native possessory claims covering the major part of the Alaskan land area in which the State could be expected to make a good portion of its selections. Indeed, it is fair to say that the views of Congress on how the authorization for State selection of more than 100 million acres of land could be reconciled with preservation of Native possessory rights based on aboriginal title were so obscure as scarcely to rise to the dignity of intent. Nevertheless, if Section 4 of the Act is to have any real significance at all, it would have to be construed as barring approvals by the Secretary which would result in transferring out of "the absolute jurisdiction and control of the United States" any lands "the right or title to which" was held by Alaskan Natives or held by the United States for such Natives. It is important to note that the phrase "absolute jurisdiction and control" did not slip into the Act unnoticed. The Senate Committee on Interior and Insular Affairs, when it was considering an early version of the Statehood Act,

struck the words "jurisdiction and" for the reason that:

> . . . 'absolute jurisdiction' is a term of art describing a status of authority which is not presently exercised by the United States over Indian lands within the United States. The bill in its present form does not and is not intended to change or affect the laws of the United States relating to jurisdiction over Indian or native lands.[30]

Despite these reservations of the Senate Committee, the language was restored in the bill which was finally enacted.[31] The Court also notes the clear intent of Congress to reserve for either future legislative action or judicial determination the matter of indigenous rights.[32] It is hard to see how these rights could remain for legislative or judicial determination if lands in which such rights existed could be transferred, even tentatively, to State control at the stroke of the Secretary's pen.[33]

The construction of the Statehood Act which plaintiffs urge is, moreover, supported by relatively recent authority in another circuit. State of Alaska v. Udall, 420 F.2d 938 (9th Cir. 1969). In that case, a Ninth Circuit panel reversed a District Court decision granting summary judgment in favor of the State of Alaska, which was seeking to compel Secretary Udall "to issue a patent and grant tentative approval to certain lands selected by the state pursuant to section 6(b) of the Alaska Statehood Act."

---

29. Wilderness Society et al. v. Morton et al., 156 U.S.App.D.C. 121, 479 F.2d 842 (February 9, 1973), at 855.

30. S.Rep.No.1163, 85th Cong., 1st Sess., 15 (1957).

31. The later amendment of this Section to take lands held by the United States in its own right out from under the "jurisdiction and control" provision also indicates that this language was meant to have more than merely symbolic significance. See Note 14, *supra.*

32. See Note 28, *supra.*

33. Congress could, of course, have authorized a transfer of title to the State with a promise that it would act as rapidly as practicable to extinguish all possessory rights therein so as to free the State title of the encumbrance. Buttz v. Northern Pacific Railroad, 119 U.S. 55, 7 S.Ct. 100, 30 L.Ed. 330 (1886). There is, however, no language similar to that which was before the Court in *Buttz* to indicate such an intent. Failure to adopt this strategy did not, of course, preclude Congress from later deciding to extinguish aboriginal title in certain lands retroactively. See discussion in Section VIII below.

Circuit Judge Hamley, speaking for the panel, held that summary judgment was inappropriate since there were genuine issues of material fact as to whether Native intervenors, who claimed possessory rights in the lands concerned, actually used and occupied these lands or had done so in the past. Circuit Judge Hamley stated that the panel was "unwilling" to hold "that under no circumstances could Indian trapping, hunting, and camping . . . constitute a condition which would deprive the selected lands of the status of being 'vacant, unappropriated, and unreserved.'" 420 F. 2d at 940.

To summarize, the Statehood Act, read as a whole and read in the light of a legislative history showing an intent on the part of Congress to avoid any prejudice to Native possessory rights until such time as Congress should determine how to deal with them, did not authorize the State to select lands in which Natives could prove aboriginal rights based on use and occupancy. Accordingly, tentative approvals by the Secretary of Interior of land selections in which such rights can be proven were void at the time they were granted. However, Native possessory rights were in no way expanded or given formal recognition in the Act, so that they remained in the status described above in Section V.

VII. *The Federal Fiduciary Duty, Department of Interior Regulations, and Due Process.*

Plaintiffs have also charged defendants with violating their duties pursuant to the federal trust responsibility for Native Americans, various departmental regulations apparently devised to protect Native occupancy rights, and due process guarantees embodied in the Administrative Procedure Act, 5 U.S.C. §§ 551–559, and in the Fifth Amendment. For the reasons given in the discussion following, the Court finds that summary judgment in favor of defendants as to all of these claims would be improper.

There are clearly issues of fact as to whether the possessory rights claimed in this action existed at the time various violations alleged by plaintiffs occurred, if they did occur. Summary judgment in favor of defendants would be appropriate only if the Settlement Act were found to extinguish all the causes of action alleged, including those for alleged trespasses, or if it could be shown that the federal trust responsibility, the cited Department of Interior regulations, and the Constitutional and statutory due process guarantees offered no protection to plaintiffs in their enjoyment of possessory rights in aboriginal lands. The effect of the Settlement Act is discussed in Section VIII below. At this point, what the Court must determine is whether plaintiffs, assuming they can prove their factual claims, enjoyed all the protections cited above, at least until the Settlement Act extinguished aboriginal title in Alaskan lands.

As to the alleged fiduciary obligation imposed on the federal government to protect the interests of Native Americans, a lengthy examination of cases cited by plaintiffs is unnecessary. Whether or not cases concerning Indian lands in the "lower 48" are on point, it is clear from the Supreme Court's opinion in *Tee-Hit-Ton, supra,* that federal officers are obligated to protect aboriginal lands "against intrusion by third parties" until such time as Congress acts to extinguish possessory rights therein. 348 U.S. at 279, 75 S.Ct. 313. It is difficult to see how transferring lands out of federal jurisdiction and control could be consistent with carrying out this duty of protection.

Defendants' possible breach of their duty of protection is even plainer where the direct issuance to third parties of special land use permits,[34] blasting licenses, and the like is concerned. Most such permits and licenses would

---

34. See Note 20, *supra,* for citation to a case in which certain of the special land use permits involved here have been declared invalid on other grounds.

necessarily authorize physical intrusions on the lands for which they were issued, and if plaintiffs could show their use and occupancy was disturbed thereby at a time when their use and occupancy rights were in force and effect and unextinguished, it would certainly be plain that defendants had violated their duty to protect plaintiffs from third party intrusions. Issuance of such permits or licenses would also be a clear violation of Department of Interior regulations designed to protect Native rights in lands actually occupied by them. See, e.g., 43 C.F.R. §§ 2091.5 and 2091.6–3 (1972). Plaintiffs have not, in their Amended Complaint, charged defendants with any denial of due process in the actual issuance of such permits or licenses. However, they do charge that all trespasses which allegedly occurred on lands possessed by them, whether occurring under the color of permits and licenses or not, were a foreseeable consequence of unlawful tentative approvals of State selections, and they allege that those approvals were given without according them due process. Specifically they charge that they did not receive that degree of notice and opportunity to be heard which is guaranteed by the Fifth Amendment and by the Administrative Procedure Act, 5 U.S.C. §§ 551–559. Insofar as this alleged denial of due process is claimed to have led to trespasses on lands in which they had use and occupancy rights, plaintiffs do have a cause of action; for as the next Section will show, this cause of action was not extinguished by the Settlement Act.

### VIII. *Effect of the Settlement Act.*

As described in Section III above, defendants' position is that the Settlement Act bars litigation of all the claims set forth in plaintiffs' Amended Complaint. As defendants construe the complaint, all of the claims rest ultimately on abo-

riginal title, and aboriginal title was extinguished by the Act. Thus the basis for the claims was destroyed. In making this argument, defendants point to both the sweeping language of Section 4 of the Act[35] and the Act's legislative history, which indicates an intention to settle conclusively all conflict over land rights between Alaskan Natives and the State of Alaska. At this point, a brief review of the mechanism set up by the Settlement Act is in order.

It is, of course, clear that the Act extinguished all aboriginal title, granting the Natives in return fee simple title to 40 million acres of land, and the payment of approximately $950 million over a period of years, part of the funds to come from mineral resources representing a two percent royalty on leasable minerals in public lands and certain lands previously selected by the State. Of the 40 million acres, 22 million are to be conveyed to Native Villages, 16 million to regional corporations set up under the Act, and 2 million to be set aside for Natives not living in villages and for certain other specified purposes. Although generally the lands to be withdrawn by the Secretary of Interior for village and regional corporation selections are to consist of lands lying within a 25-township area around each village, federal reserves and previous selections by Alaska make this impossible in certain cases. When, for these reasons, the available lands in the 25-township area are insufficient to provide for regional selection entitlements, lands three times the size of the deficiency are to be withdrawn "in lieu of lands in the nearby areas," and selections are to be made from this "in lieu" withdrawal.[36]

The Arctic Slope is one of the twelve regions for which a regional corporation is set up under the Act, and under the Act as the defendants read it, a large proportion of Native selections in this

---

35. See text of Section 4, *supra*, pp. 14–15.

36. Tentatively approved State selections in a three-township area around each village will not, however, bar Native selections therein.

Thus each village can secure title to land in its immediate vicinity regardless of prior State selections. *See* Sections 11(a)(2) and 12(a)(1) of the Act, 85 Stat. 688, at 696, 701.

region will be "in lieu" selections. This results from the previous selections made by the State in this area, and the existence there of Naval Petroleum Reserve No. 4 (in which five of the eight Arctic Slope villages are located) and the Arctic National Wildlife Refuge.[37]

Plaintiffs strongly object to being relegated to making the bulk of their selections, as they see it, from "interior land far from their villages with no surface value and no known mineral value." [38] Their challenge to the validity of the Secretary's tentative approvals of certain State land selections prior to passage of the Settlement Act is thus intended to result in making all those Arctic Slope lands tentatively approved for State selection available to them for selection under the Settlement Act.

 This attempt by plaintiffs to challenge title to lands selected by Alaska and tentatively approved under Section 6(g) of the Statehood Act must be rejected despite this *Court's* finding that the approvals were void when granted. Section 4(a) of the Settlement Act expressly validates those approvals by retroactively removing the only impediment to selection of the lands, i.e., by stating that those approvals (as well as other prior conveyances) "shall be re-

garded as an extinguishment of the aboriginal title thereto, if any." Section 14(g) makes it clear that leases issued under Section 6(g) of the Statehood Act are also converted to "valid existing rights" which cannot be defeated by Native selections under the Settlement Act.[39]

 There is good authority for the proposition that Congress can, for its own purposes, retroactively validate actions of federal officers which were void when originally taken. In Shoshone Tribe of Indians v. United States, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937), the Supreme Court held that tortious action taken by the Commissioner of Indian Affairs in 1878, which divested the Shoshones of half of their reservation lands by settling an Arapahoe band in those lands, could be later "ratified" by Act of Congress. In *Shoshone Tribe* compensation was required because reservation lands with a congressionally recognized compensable interest were involved.[40] However, in the instant case, the plaintiffs never had such a compensable interest in their lands, so action by Congress to effect a transfer of the lands could not be a Fifth Amendment taking regardless of whether such action is prospective or

---

37. The Natives are, of course, still free to live in these areas, and they can gain title to the surface estate; they are, however, barred by Section 14(f) from acquiring the subsurface estate therein. 85 Stat. 688, at 704. (Where there is no such statutory bar to acquisition of the subsurface estate, that estate can be patented to the appropriate regional corporation.)

38. Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, at p. 24.

39. Section 14(g), 85 Stat. 688, at 704, provides in pertinent part:
All conveyances made pursuant to this Act shall be subject to valid existing rights. Where, prior to patent of any land or minerals under this Act, a lease, contract, permit, right-of-way, or easement (including a lease issued under section 6(g) of the Alaska Statehood Act) has been issued for the surface or minerals covered under such patent, the patent shall contain provisions making it subject to the lease, contract, permit, right-of-way, or easement, and the right of

the lessee, contractee, permittee, or grantee to the complete enjoyment of all rights, privileges, and benefits thereby granted to him. Upon issuance of the patent, the patentee shall succeed and become entitled to any and all interests of the State or the United States as lessor, contractor, permitter, or grantor, in any such leases, contracts, permits, rights-of-way, or easements covering the estate patented, and a lease issued under section 6(g) of the Alaska Statehood Act shall be treated for all purposes as though the patent had been issued to the State.

40. In a later case involving Indian rights to compensation, the Court cited *Shoshone Tribe* as standing for the proposition that "where lands have been reserved for the use and occupation of an Indian Tribe by the terms of a treaty or statute, the tribe must be compensated if the lands are subsequently taken from them." Sioux Tribe of Indians v. United States, 316 U.S. 317, 326, 62 S.Ct. 1095, 1099, 86 L.Ed. 1501 (1942).

retroactive.[41] In granting the Natives benefits in the form of money, land, and oil royalties Congress was simply responding, whether generously or otherwise, to the strong moral claims of the Natives to compensation.

The same principle applies to the oil leases sold by the State to various companies, the validity of which depends on the validity of the approvals issued to the State. As demonstrated in Section II above, the *ownership* of natural resources is vested in the United States, and property of this kind belonging to the United States is entirely subject to disposition by Congress.[42] Congress has decided to dispose of this property by ratifying a prior transfer of oil and gas reserved to the State for leasing to third parties. No compensable interest of plaintiffs, as against the sovereign, in the oil and gas had ever been recognized by Congress and none could arise simply from the ratification of prior tentative approvals.

■ In short, Congress could constitutionally, and did in effect, give the State good title to land tentatively approved before the Settlement Act for patent to the State. It did this by removing the only impediment to the validity of the approvals rather than by making a new conveyance of title. In doing this, Congress fully intended that there should be no further "cloud" on land titles in Alaska stemming from aboriginal land claims,[43] and that legal

challenges to title based on such claims should be barred. For these reasons, and because no genuine issues of material fact exist in this matter, judgment should be entered in favor of defendants on all of plaintiffs' claims which, if successful, would result in the cancellation of patents or tentative approvals of State selections made under Section 6 of the Statehood Act or in the cancellation of leases and sales executed by the State pursuant to Section 6(g) of the Act. Because the Settlement Act extinguishes all aboriginal title in Alaskan lands, summary judgment in favor of defendants is appropriate also on those claims which, if successful, would result in an order enjoining the future issuance by the Secretary of Interior of patents, leases, permits, or licenses on Arctic Slope lands.

■ Plaintiffs' claims, however, for relief to compensate for alleged pre-Settlement Act trespasses stand on a different footing. As explained earlier, until their possessory rights based on use and occupancy were extinguished by Congress, plaintiffs had a right to be protected by the sovereign against third-party intrusions. *Tee-Hit-Ton Indians,* 348 U.S. at 279, 75 S.Ct. 313. If plaintiffs were in fact disturbed in their use and occupancy by trespassers, i. e., by any parties coming onto the land except for those entering under Congressional authorization, then there accrued a cause of action in tort against the trespassers and a cause of action for trespass and

---

41. Plaintiffs cannot avoid this result by their allegations of due process violations at the time the selections were tentatively approved since, without Congressional recognition, they had acquired no ownership interests, as against the sovereign, in the land. *Tee-Hit-Ton Indians, supra*; Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 340, 65 S.Ct. 690, 89 L.Ed. 985 (1945); Sioux Tribe of Indians v. United States, 316 U.S. 317, 326, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942). Due process guarantees are intended to safeguard interests "a person *has already acquired* in specific benefits." Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (emphasis added). Plaintiffs' allegations of

due process denials as to physical intrusions which disturbed their use and occupancy of the land are, of course, another matter. *See* discussion below, pp. 37–39.

42. United States v. Gratiot, 39 U.S. (14 Pet.) 526, 10 L.Ed. 573 (1840). The authors of the Senate Report accompanying S. 35, the Senate version of the proposed claims settlement legislation, commented: "[T]he Native people have no usable property rights in the commercial resources of the lands they have historically used and occupied." S.Rep. 92–405, 92d Cong., 1st Sess. 72 (1971).

43. S.Rep. 92–405, *supra*, at 86.

for breach of fiduciary duty against federal officers authorizing such trespasses.

It is not at all clear that the Settlement Act bars litigation of plaintiffs' claims relating to the alleged trespasses even though they are linked to claims of aboriginal title. Section 4(c) might at first blush appear to bar such litigation since it states that "All claims against the United States, the State, and all other persons that are based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska . . . are hereby extinguished." However, Senate Report No. 92–405, explaining similar language [44] in S. 35 states that "all claims which are based upon grounds other than the *loss of* original Indian title land" remain in effect (emphasis added). Included in these unextinguished claims, the Report explains, are "suits for an accounting for funds belonging to Natives or Native groups in the custody of the United States, *for tort* or breach of contract, and for violations of the fair and honorable dealings clause of the Indian Claims Commission Act" (emphasis added).[45]

In any event, a construction of Section 4 to bar claims relating to pre-Settlement Act trespasses would appear to create constitutional infirmities in the Act which are better avoided if a constitutionally sound construction does not violate clearly expressed legislative intent. United States v. Vuitch, 402 U.S. 62, 70, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971). For the Supreme Court did not hold in *Tee-Hit-Ton* that claims to compensation for third-party trespasses, occurring as a result of the breach of a federal duty of protection owed the Natives, could be extinguished by the sovereign without satisfying Fifth Amendment requirements. Such claims would be grounded not on ownership of land, but on rights to be protected by the federal government against unauthorized intrusions and rights to due process. Plaintiffs are entirely correct in their contention that insofar as these claims represent *accrued* causes of action for trespass and breach of fiduciary duty, they are vested property rights protected by the Fifth Amendment. Coombes v. Getz, 285 U.S. 434, 448, 52 S.Ct. 435, 76 L.Ed. 866 (1932); Ettor v. City of Tacoma, 228 U.S. 148, 33 S.Ct. 428, 57 L.Ed. 773 (1913); Keller v. Dravo Corporation, 441 F.2d 1239, 1242 (5th Cir. 1971). Plaintiffs may be able to prove that their graveyards were desecrated and their hunting grounds torn up by bulldozers during a period when the federal government was bound to protect them from intrusions on lands used and occupied by them; and they may prove further that this occurred without reasonable notice and opportunity to be heard. This Court will not hold that a later Act of Congress could wipe out all claims against any person for these injuries simply because Congress has decided to extinguish aboriginal title.

## IX. *Other Defenses.*

Defendants' contention that this action is barred by reason of plaintiffs' failure to exhaust administrative remedies under the Settlement Act can be quickly disposed of. The claims

---

**44.** "SEC. 4. (a) The provisions of this Act shall constitute a full and final settlement and extinguishment of any and all claims against the United States, the State and all other persons which are based upon aboriginal right, title, use, or occupancy of land in Alaska (including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist) by any Native, Native Village, or Native group or claims arising under the Act of May 17, 1884 (23 Stat. 24), or the Act of June 6, 1900 (31 Stat. 321), or any other statute or treaty of the United States relating to Native use or occupancy of land, including all claims based upon aboriginal right, title, use or occupancy pending before any court or the Indian Claims Commission on the effective date of this Act. All prior conveyances of public land and water areas in Alaska, or any interests therein, pursuant to Federal law, including tentative approvals pursuant to section 6(g) of the Alaska Statehood Act, shall be regarded as an extinguishment of any and all Native claims thereto." S.Rep. No. 92–405, *supra*, at 3.

**45.** *Id.*, at 110–11.

which this Court has found to have survived the Act—the claims regarding pre-Settlement Act trespasses—are not remediable under the Settlement Act, so there are no appropriate remedies to exhaust.

■ Defendants' contention that the action is barred by laches is equally insubstantial. Defendants concede that numerous protests were filed by plaintiffs and other Alaskan Natives, since they argue that the Settlement Act was intended to put an end to the conflict created by the protests.[46] Defendants and others concerned chose to ignore these protests, and they cannot reasonably claim that this decision was reached in reliance on any action or inaction by plaintiffs. Plaintiffs might well have waited to file suit until after passage of the Settlement Act because they thought Congress might provide complete remedies in the Act for the wrongs they believed they had suffered.

■ As to defendants' argument that the action must be dismissed for failure to join indispensable parties, that argument concerns only the effect of a decree which would impair present interests of the State of Alaska and various oil companies in the lands which plaintiffs claimed were theirs on the basis of aboriginal title. In view of this Court's ruling that defendants are entitled to summary judgment on all claims which challenge present interests in the lands concerned, this defense of nonjoinder of indispensable parties must fail.

■ Defendants' argument that this action is barred because it is an unconsented suit against the sovereign must also be rejected. The two exceptions to the sovereign immunity doctrine delineated in Larson v. Domestic & Foreign Corporation, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), are cases in

which a federal officer is alleged to have acted in excess of his statutory powers and cases in which an officer is alleged to have acted in violation of the Constitution. 337 U.S. at 689–690, 69 S.Ct. 1457. See also Dugan v. Rank, 372 U.S. 609, 621–622, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963);[47] and Ickes v. Fox, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937). In the instant case, plaintiffs have alleged that defendants were without statutory authority under the Statehood Act to permit even the tentative transfer of the lands plaintiffs claim to have held by use and occupancy, and that defendants violated plaintiffs' Fifth Amendment rights by taking actions affecting plaintiffs' rights without giving plaintiffs reasonable notice and an opportunity to be heard on the matter. Even given this Court's holding that the Settlement Act retroactively validated the tentative approvals of land for State selection, the matter of the pre-Settlement Act trespasses remains; for as this Court has also held, Congress could not retroactively give defendants the authority to forsake their fiduciary duty to Native Americans by permitting third parties to interfere with plaintiffs' use and occupancy before aboriginal title was extinguished. Hence, plaintiffs' claims relating to pre-Settlement Act trespasses appear to fall within the exceptions set forth in Larson.

Moreover, plaintiffs base their due process claims in part on the Administrative Procedure Act, 5 U.S.C. § 701 et seq., and the Court of Appeals for this Circuit has held that Congress has waived sovereign immunity as to cases to which this Act applies. Scanwell Laboratories, Inc. v. Shaffer, 137 U.S. App.D.C. 371, 424 F.2d 859, 873 (1970). Of course, no such waiver could be found if Congress had elsewhere expressed its intent to prevent judicial re-

---

46. See Note 10, *supra*, for reference to exhibits filed with plaintiffs' Amended Complaint; their genuineness is not disputed by defendants.

47. It should be noted that, in *Dugan*, the Supreme Court held that the federal officers

there named as defendants had been acting within the scope of authority given by Congress and that the seizures of water which gave rise to the action were takings by the government rather than trespasses.

view. However, this Court has found that, although the Settlement Act foreclosed review of certain of plaintiffs' claims, it did not foreclose review of federal officers' actions relating to pre-Settlement Act trespasses.

There might conceivably be some cases in which "the immunity doctrine is so transcending as to require dismissal of the suit" despite claims based on the Administrative Procedure Act, State of Washington v. Udall, 417 F.2d 1310, 1320 (9th Cir. 1969), but this does not appear to be such a case. Whether this suit should result in a recovery of damages from the individual defendants[48] or in some form of equitable relief, e. g., an order requiring defendants to take action on plaintiffs' behalf to recover damages from any parties shown to have trespassed on plaintiffs' lands before extinction of their aboriginal title, it does not appear that the judgment would "interfere with the public administration" or "expend itself on the public treasury." Dugan v. Rank, 372 U.S. at 621, 83 S.Ct. at 1007, citing Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). In ruling thus on the sovereign immunity defense, this Court is not intimating its views on the proper form of relief should plaintiffs prove their claims; it holds only that the doctrine of sovereign immunity is not a bar to the claims in this suit relating to pre-Settlement Act trespasses.

█ Finally, the Court finds no merit in the contention that Section 2(f) of the Settlement Act indicates that the Court lacks subject matter jurisdiction. That section provides that no provision of the Act shall be construed to grant jurisdiction for suits against the United States and its officers "with respect to the claims extinguished by the operation of this Act." The plaintiffs have not alleged jurisdiction on the basis of that Act. Among the jurisdictional grounds they do allege are 28 U.S.C. §§ 1331, 1332, and 1362. Nothing in Sec-

tion 2(f) of the Settlement Act would clearly destroy these independent sources of jurisdiction, and the presumption is always in favor of judicial review. Barlow v. Collins, 397 U.S. 159, 167, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

The Court cannot pretend that justice in a Platonic sense can be rendered in this case. Perhaps in an ideal system of moral accounting, plaintiffs would be entitled to all of the lands they have claimed regardless of the interests claimed by the State of Alaska and others in those lands. This Court is, however, not free to allow plaintiffs to proceed on such a theory when decisions of the Supreme Court and Acts of Congress foreclose it. The Court can, and it has here attempted to, set forth the framework within which plaintiffs can seek to establish the factual bases for the relief to which they are entitled under the Constitution and laws of the United States if their claims are proven.

---

48. Bivens v. Six Unknown FBI Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), may be applicable to the alleged

Fifth Amendment violations. But see Mr. Justice Harlan's concurring opinion at 409, note 9, 91 S.Ct. at 2011.