**UNITED STATES of America, Plaintiff,**

**Inupiat Community of the Arctic Slope, Plaintiff-Intervenor,**

v.

**ATLANTIC RICHFIELD COMPANY et al., Defendants.**

No. A 75–215 Civil.

United States District Court, D. Alaska.

June 3, 1977.

G. Kent Edwards, U.S. Atty. by John D. Roberts, Asst. U.S. Atty., Anchorage, Alaska, James J. Clear, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Edward A. Merdes, Mark A. Sandberg, Merdes, Schaible, Staley & DeLisio, Inc., Anchorage, Alaska, O. Yale Lewis, Jr., Wickwire, Lewis, Goldmark, Dystel & Schorr, Seattle, Wash., for intervenor.

Avrum M. Gross, Atty. Gen., Anchorage, Alaska, for State of Alaska.

Richard O. Gantz, Hughes, Thorsness, Powell & Brundin, Anchorage, Alaska, for defendants Dowell, Div. of Dow Chemical, Exploration Logging of USA, Exxon Co., USA, Halliburton Co., Loffland Bros. Co., McCulloch Oil Corp., Niedermeyer-Marting Co., Schlumberger, Ltd., Wagley, Inc., Teledyne Exploration Co., Teledyne Industries, Inc., Superior Oil Co., R. B. Montgomery Drilling, Inc., Humble Oil & Refining, National Geophysical Co., by Teledyne, Successor and Exxon Pipeline Co.

Atkinson, Conway, Young, Bell & Gagnon, Anchorage, Alaska, for defendants ATCO Housing, dba ATCO Structures, National Mechanical Contractors, Polar Oil Field Services.

Birch, Jermain, Horton & Bittner, Anchorage, Alaska, for defendant Hewitt Lounsbury & Assoc.

William V. Boggess, Fairbanks, Alaska, for defendants James A. Dalton & Assoc. and Stutzmann Eng. Assoc.

Burr, Pease & Kurtz, J. W. Sedwick, Anchorage, Alaska, for defendants Green Const. Co., Union Oil Co. of California, Alaska Geophysical, Inc. and Digicon Alaska, Inc.

Charles E. Cole, Fairbanks, Alaska, for defendants Burgess Const. Co. and Spruce Equipment Co.

Richmond & Willoughby, Anchorage, Alaska, for defendants Alaska Barge & Trans., Inc., Battelle Pacific Northwest Laboratories, General Const. Co., Goodyear Tire & Rubber Co., Pac. Inland Navigation Co., Universal Services, Inc. and Alaska General Const.

Paul F. Robison, Robison, McCaskey, Reynolds & Frankel, Anchorage, Alaska, for defendant Pipeline Technologists, Inc.

Charles E. Tulin, Anchorage, Alaska, for defendants S & G Const., Inc. and Winship Air Service.

Hugh G. Wade, Anchorage, Alaska, for defendants Rivers C & M Co.

H. Bixler Whiting, Whiting & Blanton, Fairbanks, Alaska, for defendants J & J Equipment, Inc. of Alaska.

Klimit E. Giddens, in pro. per. and for defendants Borst & Giddens Oil Well dba Logging Serv., Inc.

Hagans, Smith & Brown, Anchorage, Alaska, for defendants Geophysical Service, Inc., Reading & Bates Offshore Drilling Co., Reading & Bates Oil and Gas Co. and United Geophysical Corp.

Hoge, Lekish, Cardwell, Marquez & Lawrence, Anchorage, Alaska, for defendants Sea Automotive, Inc.

Holland & Thornton, Anchorage, Alaska, for defendants Colorado Oil & Gas Corp., Era Helicopters, Inc., Forest Oil Corp., Hunt Oil Co., Marathon Oil Co., Merric, Inc., Mobil Oil Corp., Parker Drilling Co., Phillips Petroleum Corp., Placid Oil Co., Mo-

bile Pipeline Co., Socony Mobil Oil Co. and Amerada Hess Corp.

Ely, Guess & Rudd, Anchorage, Alaska, for defendants Alyeska Pipeline Serv. Co., BP Oil Corp., by Sohio Petroleum Co., Successor Evergreen Helicopters of Alaska, Inc., Kaiser Steel Corp., Michael Baker, Jr., Inc., Newmont Oil Co., Prudhoe Bay Communications, by Sohio Trans. Co., formerly Prudhoe Bay Comm., Shell Oil Co., Sohio Petroleum Co., ARCO Pipeline Co., BP Alaska Exploration, BP Alaska, Inc., BP Pipelines, Inc. and Woodward-Lundgren Assoc.

Barry Donnellan, Anchorage, Alaska, for defendants Ramstad Const. Co.

M. P. Evans, George A. Dickson, Anchorage, Alaska, for defendants S. S. Mullens, Inc., dba S. S. Mullen Const.

Faulkner, Banfield, Doogan & Holmes, Juneau, Alaska, for defendants Atlantic Refining Co., Atlantic Richfield Co., Richfield Oil Corp. and Sinclair Oil Corp.

James E. Fisher, Kenai, Alaska, for defendants Better Concrete Products Corp.

Gallagher, Cranston & Snow, Anchorage, Alaska, for defendants Sourdough Freight Lines, Inc.

Stephen S. Hart, Graham & James, Anchorage, Alaska, for defendants Nabors Alaska Drilling.

Cole, Hartig, Rhodes & Norman, Anchorage, Alaska, R. T. Robberson, Houston, Tex., for defendants Alaska Geophysical, Inc., Core Laboratories, Inc., Digicon Alaska, Inc., Dresser Industries, Inc., Lindsay & Associates, Lorac Service Corp., Madrel, dba Ray Geophysical, Occidental Petroleum, Western Geophysical Co. of America, Continental Laboratories and The Superior Oil Co.

Ralph G. Crews, Anchorage, Alaska, for defendants Gulf Oil Corp., Pan American Petroleum and Texaco, Inc.

Delaney, Wiles, Moore, Hayes & Reitman, Anchorage, Alaska, for defendants Alaska Airlines, Boatel Alaska, Inc., Eastman Oil Well Survey, Rowan Drilling Co., dba Row-

an Drilling U.S., Standard Oil Co. of Cal., Whipstock Alaska, Globe Universal Sciences, Hamilton Brothers Oil and Frontier Rock & Sand, Inc.

Robert L. Hartig, Anchorage, Alaska, Michael R. Waller, Karen A. Berndt, Houston, Tex., for defendants Digicon Alaska, Inc. and Alaskan Geophysical, Inc.

Karl S. Johnstone, Anchorage, Alaska, for defendants C. R. Lewis, Inc.

Denis R. Lazarus, Anchorage, Alaska, for defendants Olympic, Inc.

McCarrey & McCarrey, Anchorage, Alaska, for defendants Wien Air Alaska.

Philip D. Maloney, Anchorage, Alaska, for defendants Cities Service Oil Corp., Conoco, Inc., Sperry-Sun Well Surveying Co. and Sun Oil Co.

Nosek, Bradbury & Wolf, Anchorage, Alaska, for defendants Arctic Marine Freighters, Dye Construction, Inc., Mukluk Freight Lines, Inc., Oilfield Service, Inc. and Puget Sound Tug & Barge Co.

Thomas P. Owens, Jr., Owens, Riordan & Turner, Anchorage, Alaska, for defendants Atwood Enterprises, Inc. and Brinkerhoff Drilling Co.

Rice, Hoppner & Hedland, Fairbanks, Alaska, for defendants Earthmovers of Fairbanks, Inc.

Groh, Benkert & Walter, Anchorage, Alaska, for defendants Locher Construction Co., dba Locher Co., Inc. and Western Offshore Drilling & Exploration Co.

## OPINION

FITZGERALD, District Judge.

The United States, acting in its own behalf and on behalf of Eskimos inhabiting the Arctic Slope of Alaska, sues the State of Alaska and one hundred forty corporations and private parties for trespass to Native land prior to the passage of the Alaska Native Claims Settlement Act.[1] The intervenor, Inupiat Community of the Arctic Slope, a recognized Eskimo tribal

---

1. 43 U.S.C. § 1601 *et seq.* Hereinafter referred to as the Settlement Act.

entity, makes similar but somewhat more extensive claims.[2]

The underlying theory of both the complaint and the complaint in intervention is that until the 1971 Settlement Act the Eskimos of the Arctic Slope had a right of exclusive possession to the Arctic Slope of Alaska based on use and occupancy of that region from time immemorial, or as it is sometimes termed, "aboriginal title."

The case is here on defendants' joint motion to dismiss all claims of trespass to land claimed on the basis of aboriginal title.[3] The case raises important questions of law arising under the Settlement Act and federal common law regarding Indian rights. In order to fully develop the issues presented, it is necessary to review the background of the Settlement Act.

Jurisdiction over the claims of the United States is conferred by 28 U.S.C. § 1345. Jurisdiction over the claims of intervenor is based on 28 U.S.C. §§ 1331, 1362.

## I. HISTORY OF ALASKA NATIVE LAND CLAIMS

The claims of the Native people to the land and resources of Alaska had been a source of potential conflict and uncertainty for over a century before Congress finally undertook to settle the aboriginal claims in the late 1960's.

The Treaty of Cession[4] by which the United States purchased Alaska from Russia in 1867 did not address the property rights of the Native inhabitants. It provided that the Natives would be subject to such laws as the United States might adopt with respect to aboriginal tribes.

The first statute to mention the land rights of Alaska Natives was the Organic Act of 1884[5] which provided for a civil government and extended the mining laws of the United States to Alaska. Section 8 of the Organic Act provided:

> . . . that the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress . . .

Congress proceeded to open Alaska to settlement and development by extending the general land laws to Alaska. The Act of March 3, 1891 authorized the establishment of townsites and conveyances of town lots to individual occupants.[6] In 1898 Congress extended the homestead laws to Alaska[7] and in 1900 the mining laws of the United States to Alaska in the second Or-

---

2. More specifically, the United States claims damages for entries to land aboriginally used and occupied by the Arctic Slope Natives where: (1) the entry was unauthorized; (2) the entry and trespass were under color of the Statehood Act of 1958, 72 Stat. 339, but in violation of explicit terms contained therein which affirmatively protected Native rights; or (3) the entry was made under federal authorization but the entry interfered with substantial and notorious Native use resulting in destruction of Native possessions, such as homes, hunting or trapping grounds, and other physical structures. Damages to the Eskimos are alleged to include the disturbance of game animals, the extraction of oil and gas, the obtaining of geophysical information of great value, and the construction of roads, buildings, airfields and other structures.

Intervenor claims damages for all entries on the North Slope prior to December 18, 1971; the value of any geologic and geophysical information obtained as a result of oil exploration on Arctic Slope land; the royalty value of grav-

el or other mineral resources obtained as a result of trespass on the Arctic Slope; damages for destruction of wildlife; damages for theft or disturbance of chattels; and damages for injury to real property and structures.

3. All claims which may lie for injury to personal property or real property individually owned, as opposed to property claimed by right of aboriginal use and occupancy, are excepted from the motion to dismiss. Such claims, however, are not adequately stated by the complaints filed in this case.

4. Treaty of March 30, 1867, 15 Stat. 539.

5. Act of May 17, 1884, Ch. 53, 23 Stat. 24.

6. Act of March 3, 1891, Ch. 561, 26 Stat. 1095, 43 U.S.C. § 732.

7. Act of May 14, 1898, Ch. 299, 30 Stat. 409, 43 U.S.C. § 270.

ganic Act.[8] In 1914 Congress enacted the Alaska Coal Lands Act, directing the President to reserve potential coal-bearing lands and issue leases for those lands.[9] The Mineral Leasing Act enacted in 1920 [10] authorized the Secretary of the Interior to lease lands owned by the United States which contain deposits of coal, oil and other minerals. Some of these enactments contained provisions exempting or protecting from disposition lands actually occupied by Natives. The second Organic Act, for example, provided that Natives "shall not be disturbed in the possession of any lands now actually in their use and occupancy . . . " However, other statutes, such as the Mineral Leasing Act, did not contain any provisions respecting Native occupancy.

Under these laws, appropriate administrative officials authorized entries on, and disposition of, Alaska lands without regard to aboriginal title claims of Natives.

In the Alaska Native Allotment Act,[11] Congress for the first time provided a means by which individual Alaska Natives could obtain legal title to land they occupied. The Act provided for the allotment of homesteads of up to 160 acres of nonmineral land. However, only 80 allotments, most of which were in southeastern Alaska, were issued under the Act during the first 54 years after its passage. Knowledge of the provisions of the Allotment Act and the means to apply for lands under its provisions were not available to most Alaska Natives.[12]

Under a 1926 Act, Congress extended the provisions of the townsite laws to Alaska Natives, providing for the patenting of lots within Native townsites to the occupants. Native townsite residents received a restricted deed, inalienable except by permission of the townsite trustee.[13]

Significantly, in Alaska, unlike the Lower 48, there were never treaties between the United States and Alaska Native groups designating lands which Natives were entitled to occupy or defining their rights to the taking of fish and game. Congress created only one reservation in Alaska, an 86,000 acre reservation in southeastern Alaska for the Metlakatla Indians.[14] Between 1914 and 1917 the President made various Executive Order withdrawals of Alaskan land for the benefit of Native groups.[15] In 1936 the Secretary of the Interior was authorized to designate reservations in Alaska upon vote of the adult Native residents within the proposed reservation.[16] Only six such reservations were created, none of which were on the North Slope. Alaskans, both Native and non-Native, opposed creation of reservations on the grounds that reservations were socially divisive and tended to perpetuate a wardship rather than equality for the Natives. Four villages voted down proposed reservations and one was declared invalid by the Territorial Court. *United States v. Libby, McNeill & Libby,* 107 F.Supp. 697, 14 Alaska 37 (1952).[17]

8. Act of June 6, 1900, Ch. 786, 31 Stat. 321, *as amended,* 30 U.S.C. § 49(a).

9. Act of Oct. 20, 1914, Ch. 330, 38 Stat. 741.

10. Act of Feb. 25, 1920, Ch. 85, 41 Stat. 437, *as amended,* 30 U.S.C. § 181 *et seq.*

11. Act of May 17, 1906, Ch. 2469, 34 Stat. 197.

12. Senate Report No. 92–405, 92nd Congress, 1st Session at 91 (1971).

13. Act of May 25, 1926, Ch. 379, 44 Stat. 629, 43 U.S.C. § 733.

14. Act of March 3, 1891, Ch. 561, § 15, 26 Stat. 1101, 25 U.S.C. § 495.

15. *E.g.,* Ft. Yukon, Executive Order No. 1896 (Feb. 24, 1914); Klukwan, Executive Order No. 2227 (Aug. 2, 1915); Chilkat, Executive Order No. 2228 (Aug. 2, 1915); Yendistucky, Executive Order No. 2388 (May 25, 1916); Norton Bay, Executive Order No. 2508 (Jan. 3, 1917); Akiak, Executive Order No. 2757 (Nov. 22, 1917); Mountain Village, Executive Order No. 2757 (Nov. 22, 1917); Tatitlek, Executive Order No. 2757 (Nov. 22, 1917).

16. Act of May 1, 1936, Ch. 254, § 2, 49 Stat. 1250, 25 U.S.C. § 496.

17. Federal Field Committee for Development Planning in Alaska, *Alaska Natives and the Land,* Chap. V. See also, E. Gruening, *The State of Alaska,* Ch. 25, pp. 365–381 for an account of the opposition of Alaskans to the Department of Interior's plan to create Indian reservations throughout Alaska.

In 1935 Congress enacted a jurisdictional statute which allowed the Tlingit and Haida Indians of southeastern Alaska to bring suit in the Court of Claims for compensation for land and tribal property rights expropriated by the United States and for the failure by the United States to protect those property rights from usurpation by non-Natives.[18] However, it took over 35 years for the Tlingits and Haidas to receive compensation.

In 1959 the Court of Claims held that the Tlingits and Haidas had established title to six areas.[19] Judgment for $7,546,053.80 was entered in 1968. Money was not appropriated to pay the judgment until 1970.

Nevertheless, the Tlingit and Haida Indians fared better than the Tee-Hit-Tons, who failed to get any compensation whatsoever when they went to court without the aid of a jurisdictional statute. The Supreme Court held that unrecognized aboriginal title was not a property interest protected by the Fifth Amendment from government taking without compensation. *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955).

When the *Tee-Hit-Ton* decision was handed down, Congress was deliberating the question of statehood for Alaska. However, statehood was not approved until 1958 when Congress enacted the Alaska Statehood Act.[20]

The confrontation of Native and non-Native over ownership and use of the land accelerated after statehood. Section 6 of the Statehood Act authorized the State to select 102,500,000 acres from public lands that were "vacant, unappropriated, and unreserved at the time of their selection."[21] The intent of Congress was, of course, to provide the new state with a solid economic foundation.[22] State land selections required the approval of the Secretary of the Interior who was the official with authority to patent selected lands to the State.[23] Section 6(g) authorized the State to execute conditional leases and make conditional sales of selected lands following tentative approval but prior to issuance of the final patent.[24]

The Statehood Act further provided that the State of Alaska would receive 90% of the revenues derived by the United States from coal and mineral leases of the lands retained by the United States in Alaska.[25]

Significantly, the Statehood Act also contained a provision protecting Native rights. Section 4 of the Act provided that the State disclaimed any right or title to "any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts . . . or is held by the United States in trust for said Natives . . ."[26]

---

**18.** Act of June 19, 1935, Ch. 275 § 2, 49 Stat. 388.

**19.** Tlingit and Haida Indians of *Alaska v. United States*, 177 F.Supp. 452, 147 Ct.Cl. 315 (1959).

**20.** Act of July 7, 1958, Pub.L. No. 85–508, 72 Stat. 339, *as amended*, 73 Stat. 141 (hereinafter Statehood Act). 48 U.S.C. prec. 21 note.

**21.** Sections 6(a) and 6(b) of the Statehood Act, 72 Stat. 339, 340.

**22.** See, U.S. Code Congressional and Administrative News, 85th Cong., 2d Sess. (1958) Legislative History, p. 2933.

**23.** Sections 6(a) and 6(g), 72 Stat. 339, 340–341.

**24.** 72 Stat. 339, 342.

**25.** 72 Stat. 339, Section 28.

**26.** It is important to read the full text of Section 4 of the Statehood Act to understand how Section 4, when read in conjunction with the grant to the State in Section 6, is subject to differing interpretations by the parties herein. Section 4, as amended in 1959, 73 Stat. 141, provides:

As a compact with the United States said State and its people do agree and declare that they forever disclaim all right and title to any lands or other property not granted or confirmed to the State or its political subdivisions by or under the authority of this Act, the right or title to which is held by the United States or is subject to disposition by the United States, and to any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts (hereinafter called natives) or is held by the United States in trust for said natives; that all such lands or other property (including fishing rights), the right

In the 1960's the State proceeded to select land as provided in Section 6 of the Statehood Act.

In 1964 and 1965 the State selected, and the Secretary of the Interior tentatively approved, approximately 1,650,000 acres of land on the Arctic Slope, a region in which the existence of large oil deposits was suspected.[27] Reports of oil deposits in Prudhoe Bay, one of the selected areas, were confirmed in 1968. In 1969 the State conducted sales of oil and gas leases for tentatively approved Arctic Slope lands. The lease sale was vigorously protested by Alaska Natives. Nevertheless, oil companies, including a number of the defendants in this lawsuit, paid over 900 million dollars to acquire oil and gas leases.

Meanwhile, the Secretary of the Interior, in a series of public land orders issued between 1958 and 1965, had authorized locations and entries under the mining laws and leases pursuant to the Mineral Leasing Act on various areas of the Arctic Slope. Pursuant to these land orders and federal leases, numerous private parties including many of the present defendants partici-pated in oil and gas explorations on the Slope.

Certain initial State land selections were protested by the Bureau of Land Management on behalf of Native villages. As State selections continued, Alaska Natives began organizing themselves into groups and associations and the number of Native protests and land claims mounted steadily. The Alaska Federation of Natives was organized in 1966, and regional Native associations were organized throughout Alaska. By April, 1968, forty claims covering 296,-000,000 acres, approximately 80% of the State, had been filed.[28] The North Slope Native Association had filed a claim to virtually the entire North Slope.[29] In short, most of the State land area, and virtually all of the commercially valuable land, were subject to Native protests.

Partly in response to the mounting protests, the Secretary of the Interior instituted a land freeze policy whereby federal patenting and approval of State selections and other applications for public lands were suspended pending a legislative settlement of the controversy.[30]

of title to which may be held by said natives or is held by the United States in trust for said natives, shall be and remain under the absolute jurisdiction and control of the United States until disposed of under its authority except to such extent as the Congress has prescribed or may hereafter prescribe, and except when held by individual natives in fee without restrictions on alienation: *Provided*, That nothing contained in this Act shall recognize, deny, enlarge, impair, or otherwise affect any claim against the United States, and any such claim shall be governed by the laws of the United States applicable thereto; and nothing in this Act is intended or shall be construed as a finding, interpretation, or construction by the Congress that any law applicable thereto authorizes, establishes, recognizes, or confirms the validity or invalidity of any such claim, and the determination of the applicability or effect of any law to any such claim shall be unaffected by anything in this Act: *And provided further*, That no taxes shall be imposed by said State upon any lands or other property now owned or hereafter acquired by the United States or which, as hereinabove set forth, may belong to said natives, except to such extent as the Congress has prescribed or may hereafter pre-scribe, and except when held by individual natives in fee without restrictions on alienation.

**27.** Federal Field Committee, *Alaska Natives and the Land,* 456–7 (1968). During the 90th Congress the Senate Committee on Interior and Insular Affairs commissioned the Federal Field Committee for Development Planning in Alaska to prepare a report concerning the Native land claims. The report *Alaska Natives and the Land* is an important document in the legislative history of the Settlement Act. Senate Report No. 92–405, 92d Cong., 1st Sess. (1971), 74.

**28.** *Alaska Natives and the Land,* 442.

**29.** *Id.* at 456.

**30.** The land freeze was made official in Public Land Order No. 4582, issued January 12, 1969, which reads as follows:

Subject to valid existing rights, and subject to the conditions hereinafter set forth, all public lands in Alaska which are unreserved or which would otherwise become unreserved prior to the expiration of this order, are hereby withdrawn from all forms of appropriation and disposition under the public

Because the freeze was thought to be a serious threat to Alaska's economy, the State attempted, unsuccessfully, to obtain a court order requiring the Secretary of the Interior to approve pending State selections and patent others which were subject to Native claims. *Alaska v. Udall*, 420 F.2d 938 (9th Cir. 1969), *cert. denied*, 397 U.S. 1076, 90 S.Ct. 1522, 25 L.Ed.2d 811 (1970).[31] The State then turned to Congress for a solution.

Native leaders by then had also concluded that they should petition Congress for a prompt legislative settlement of their land claims. The past experience of the Tlingits and Haidas and the Tee-Hit-Tons showed that the alternative of taking the claims to court must inevitably lead to long delay.[32] Beginning in 1967, the Alaska Federation of Natives caused bills to be introduced in every session of Congress and lobbied for their passage.[33] In December, 1971, they succeeded in obtaining a legislative settlement that included substantial grants of land in addition to monetary compensation for the extinguishment of Native claims.

The express purpose of the Settlement Act, as set forth in Section 2, the Declaration of Policy, was to meet the "immediate need for a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims."[34] Congress found that a settlement had to be accomplished "rapidly, with certainty, [and] without litigation . . . ."[35]

Section 4 of the Settlement Act contains the declaration of settlement.[36] The meaning and scope of the extinguishment section is disputed by the parties to this lawsuit and is the controlling question of law now before the court.

In conjunction with these extinguishments, Section 6 of the Act provides for a cash settlement of $962,500,000 to be paid over a period of years. Of that sum, $462,500,000, or roughly half, is to be paid from the federal treasury.[37] The remainder will be paid from the revenues derived from disposing of the leasable minerals on public lands in Alaska, including lands tentatively approved to the State and lands which the State will select in the future. (Section 9)[38] In addition to the monetary grant, the Act grants the Alaska Natives fee title to more than 40 million acres of lands, to be selected by the Native villages and regional corporations from lands in Alaska withdrawn for that purpose. (Section 12)[39] All future revenues to be derived from the land patented to the Natives will, of course, be the property of the Native corporations.[40] Under the Act, individual Natives are al-

---

land laws (except locations for metalliferous minerals), including selection by the State of Alaska pursuant to the Alaska Statehood Act (72 Stat. 339), and from leasing under the Mineral Leasing Act of February 25, 1920, 41 Stat. 437; 30 U.S.C. 181 et seq., as amended, and reserved under the jurisdiction of the Secretary of the Interior for the determination and protection of the rights of the Native Aleuts, Eskimos and Indians of Alaska. The withdrawal and reservation created by this order shall expire at 12 p. m. (midnight), A.S.T., December 31, 1970.

31. The district court granted the State summary judgment, ruling that as a matter of law the land in question was "vacant, unappropriated and unreserved" and therefore open to State selection under the Statehood Act. The Ninth Circuit reversed on the ground that material questions of fact existed as to whether the lands selected by the State were actually vacant or were occupied by the Natives. The court suggested that the lawsuit be stayed pending anticipated legislative action to resolve the controversy. 420 F.2d at 940.

32. See Arnold, *Alaska Native Land Claims*, (1976) (published by Alaska Native Foundation); E. Gruening, *The State of Alaska* (1968 ed.) at 541.

33. See Senate Report No. 91–925, 91st Cong., 2d Sess. 1970, 90–99 for a detailed summary of the bills considered by the 90th and 91st Congress.

34. 43 U.S.C. § 1601(a).

35. 43 U.S.C. § 1601(b).

36. 43 U.S.C. § 1603.

37. 43 U.S.C. § 1605.

38. 43 U.S.C. § 1608.

39. 43 U.S.C. § 1611.

40. 43 U.S.C. § 1606(i).

lowed to pursue pending allotment applications.[41]

Any summary of the background to the Settlement Act and the instant lawsuit would not be complete without mention of *Edwardsen v. Morton*, 369 F.Supp. 1359 (D.D.C.1973). That case was filed October, 1971, in the United States District Court for the District of Columbia while Congress was in the final stages of consideration of the terms of the Settlement Act. The plaintiffs included Charles Edwardsen, Jr., Executive Director of the Arctic Slope Native Association, the Inupiat Community of the Arctic Slope and several Native villages and individual Eskimos of the Arctic Slope. The named defendants were the Secretary of the Interior and subordinate officials. The complaint alleged that the federal officers had unlawfully transferred and permitted trespass to Arctic Slope lands claimed and occupied by Inupiat Eskimos under aboriginal title. Plaintiffs alleged that all State land selections on the North Slope and tentative approvals thereof were illegal and sought declaratory and injunctive relief to this effect. Plaintiffs also sought an order requiring the Secretary to account to the plaintiffs for all monies received by the State of Alaska; including the $912 million received by the State in the September, 1969, Prudhoe Bay oil and gas lease sale, and other third persons as a result of the tentative approvals. The complaint was later amended to state a claim for a money judgment against the Secretary.

After passage of the Settlement Act, the defendants in *Edwardsen* moved for summary judgment on the grounds that the Settlement Act barred all of plaintiffs' claims. The district court granted summary judgment for the federal defendants on the claims to the tentatively approved State lands, holding that the Settlement Act validated all prior tentatively approved State selections. However, the district court denied summary judgment as to the accounting and damage claims, holding that the Settlement Act did not extinguish tort claims that accrued prior to enactment of the Settlement Act.

No appeal was taken from the decision of the district court in *Edwardsen*. Instead, the federal defendants entered into a stipulation with the plaintiffs which required federal officers to conduct an investigation of plaintiffs' trespass claims and thereafter to recommend that the Attorney General institute damage actions on the Natives' behalf.

This lawsuit followed.

## II. PRELIMINARY ISSUES

The main argument in support of the motion to dismiss is that the Settlement Act conclusively extinguished, and therefore bars, all claims based on aboriginal use or occupancy, including claims of past trespass to lands claimed by aboriginal title.

However, defendants also raise several preliminary issues by arguing that the aboriginal title claimed by the Arctic North Slope Eskimos was extinguished even prior to passage of the Settlement Act by operation of various federal statutes concerning disposition and use of federal land in Alaska, including the Alaska Statehood Act.

First, defendants argue that the Treaty of Cession extinguished the aboriginal title of all Native peoples in Alaska.[42]

Second, defendants contend that between cession and statehood the federal government exercised "complete dominion" over Alaska lands in a manner adverse to the existence of a Native right of exclusive possession and thereby extinguished all aboriginal title.[43]

Third, relying on the Supreme Court in *Organized Village of Kake v. Egan*, 369

---

**41.** 43 U.S.C. § 1613(h)(5), § 1617(a).

**42.** In *Miller v. United States*, 159 F.2d 997, 11 Alaska 285 (9th Cir. 1947), a condemnation action brought by the United States to obtain unencumbered fee title to tidelands in Juneau for the purpose of building a wharf, the Ninth Circuit held that no communal claim of aboriginal title survived the Treaty of Cession. How-

ever, this holding was impliedly overruled by the Supreme Court in *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955).

**43.** In *United States v. Santa Fe Pac. R.R.*, 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941), the Supreme Court stated that the right of the United States to extinguish aboriginal title may

U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962),[44] defendants argue the Statehood Act authorized the State to select and obtain clear title to lands claimed under aboriginal title, thereby extinguishing inconsistent aboriginal title to the selected lands, but preserved the Natives' right to seek compensation from the federal government for the lands granted to the State. Plaintiff and intervenor, on the other hand, contend that the intent of Congress in the Statehood Act was to preserve the status quo of Native occupancy, not to extinguish the right of aboriginal occupancy; hence State selection was limited to lands not occupied or claimed by Natives. Plaintiff and intervenor concede that under this interpretation of the Statehood Act, the State would likely end up with substantially less than the allotted

103 million acres in view of the fact that Alaska Natives claimed aboriginal title by virtue of use and occupancy to almost all of the land in Alaska.

■ These contentions raise difficult issues. To determine whether, and to what extent, aboriginal title to the Arctic Slope may have been legally extinguished prior to passage of the Settlement Act would require close examination of almost every federal statute and federal government action relating to use of Arctic Slope lands between 1867 and 1971 in order to discern if there was some clear manifestation of Congressional intent to extinguish aboriginal title. *United States v. Gemmill*, 535 F.2d 1145 (9th Cir. 1976).[45]

■ The Settlement Act, however, makes such an undertaking unnecessary. The in-

---

be exercised "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise . . . ." 314 U.S. at 347, 62 S.Ct. at 252. The Ninth Circuit recently applied the "complete dominion" theory in *United States v. Gemmill*, 535 F.2d 1145 (9th Cir. 1976), In *Gemmill*, the court reviewed a "century-long course of conduct" to conclude that a tribe's aboriginal title had been extinguished *de jure* even though any one of the specific federal actions, "examined in isolation, may not provide an unequivocal answer to the question of extinguishment." 535 F.2d at 1149.

44. In the *Kake* opinion Justice Frankfurter, relying on the early legislative history of the Section 6 disclaimer provision of the Alaska Statehood Act, stated:

It was understood that the disclaimer provision left the State free to choose Indian "property" if it desired, but that such a taking would leave unimpaired the Indians' right to sue the United States for any compensation that might later be established to be due. 369 U.S. at 65–66, 82 S.Ct. at 566.

However, *Kake* is not controlling authority for the instant case because it did not involve the issue of whether the State could select Native lands. Instead, the issue before the Court was whether the reservation of absolute jurisdiction over Native lands by the United States and the concomitant disclaimer by the State in Section 4 of the Statehood Act barred the State from applying its antifish trap conservation law to Indian fishing. The Court held the State could exercise its police powers over Indian fishing because the reservation of "absolute jurisdiction" did not mean exclusive jurisdiction and the State had disclaimed only its proprietary

interests with respect to Native land, not its governmental and political interests. 369 U.S. at 68–69, 82 S.Ct. at 562.

45. In *Gemmill*, the Ninth Circuit held that extinguishment of aboriginal title occurs when the United States acts in a manner which manifests an intention to extinguish, regardless of the means or propriety of the action. "The relevant question is whether the governmental action was intended to be a revocation of Indian occupancy rights." *Gemmill*, supra, 535 F.2d at 1148.

Contrary to intervenor's contentions, aboriginal title, as opposed to Indian title recognized by treaty or reservation, is legally extinguishable when the United States makes an otherwise lawful conveyance of land pursuant to federal statute. Congressionally authorized conveyance of lands from the public domain demonstrates the requisite intent to extinguish the Indian right of exclusive use and occupancy to those lands. Thus, as the United States acknowledges, when the Secretary of the Interior issued a patent to a homesteader in Alaska, aboriginal title was extinguished with respect to the patented land. However, since the United States retained title to almost all of the Arctic Slope during the period in question, extinguishment of aboriginal title by conveyance is not of import here. Whether tentative approval of State land selections legally extinguished aboriginal title presents a more difficult question because the Statehood Act can be read as preserving Native occupancy rights. Conveyance of land in derogation of a Congressional directive to respect and protect Native occupancy would be void and legally ineffective to extinguish aboriginal title.

tent of Congress in the Settlement Act was to settle the claims of Alaska Natives and to compensate them without deciding the difficult and disputed question of the existence and extent of aboriginal title to Alaska lands. The Act's Declaration of Settlement reads: "All aboriginal titles, *if any* . . . are hereby extinguished." (emphasis added)[46] Congress was aware that claims or aboriginal title raised difficult questions of law and fact. The difficulty was in large part due to the long delay before Congress directly confronted settlement claims based on aboriginal title. The Settlement Act was the first and only legislative action in which Congress considered and undertook to resolve the claims of Alaska Natives. The Treaty of Cession and Congressional legislation, including the Statehood Act, which preceded the Settlement Act, incidentally affected issues relating to Native land claims but did not purport to resolve them. It is appropriate then to look directly to the Settlement Act, rather than to previous legislation, to discern Congressional intent with respect to settlement and extinguishment of claims based on aboriginal title.

◼ The legislative history of the Statehood Act fails to clarify Congressional intent with respect to Native use and occupancy.[47] In fact, there is very little reference to Native land claims in the legislative history on the Statehood Act. This is so because Congress was principally concerned with achieving statehood for Alaska, not with settlement of Native land claims. Given the difficulty of winning Congressional approval for Alaska statehood,[48] Congress undertook to bypass, rather than to resolve the complex and difficult questions arising out of Native claims.[49]

Nevertheless, the Statehood Act is important insofar as it is a significant part of the background of the Settlement Act and contributes to an understanding of legislative intent in the Settlement Act. As noted, the conflicting claims by the State of Alaska and by Alaska Natives to lands selected by the State pursuant to the Statehood Act and the land freeze imposed by the Secretary of the Interior precipitated demands on Congress to enact legislation bringing about settlement of Native land claims.[50] As will be discussed in the following section, Congress specifically addressed and resolved the problem of the conflicting State and Native claims to tentatively approved lands in subsection 4(a) of the Settlement Act.

To summarize, I decline to decide whether aboriginal title to the Arctic North Slope was extinguished in whole or in part by the Treaty of Cession, or by the exercise of complete dominion over Alaska lands between cession and statehood, or by operation of the Statehood Act. The decision in this case rests on the Settlement Act since

---

**46.** 43 U.S.C. § 1603.

**47.** Defendants' interpretation of what Congress intended in the Statehood Act is more persuasive since that construction gives effect to an important purpose of the Statehood Act to insure that the new state would be economically viable. The construction urged by plaintiff and intervenor would defeat that purpose since the State would be virtually without land or resources for its support. However, given the patent ambiguity in the terms of the Statehood Act itself and the absence of clarifying legislative history, I decline to rule that the Statehood Act requires dismissal of the claims against the State and its leaseholders.

**48.** See E. Gruening, The State of Alaska, *supra,* Chap. 28, for a detailed account of the political obstacles in the path of Alaska statehood.

**49.** Senate Report 92–405 expresses a similar conclusion in explaining the background of the Alaska Native land claims. The Report concludes that Section 4 of the Statehood Act was intended to maintain the "status quo . . . with respect to Native use, occupancy, and title to lands in Alaska until Congress could act upon these questions." The Report further states that Congress "has reserved to itself the full power to define, confirm, deny, or extinguish Native title, and with minor exceptions, Congress has so far declined to do so." S.Rep. No.92–405 at 75–76, 92nd Cong., 1st Sess. (1971).

**50.** See Senate Report 92–405, 92nd Congress, 1st Session, 94–98, (1971), for the Senate Committee's account of the conflict between the State and Alaska Natives and between the State and the United States which necessitated the Settlement Act.

that legislation was specifically directed to final resolution and settlement of Native land claims. Nor is it necessary to look to other statutes to discern Congressional intent to extinguish Native land claims since I conclude, for reasons to follow, that Section 4 of the Settlement Act unequivocally extinguished claims based on aboriginal title which are asserted in this lawsuit. Accordingly, for the purposes of the motion to dismiss, it is assumed without so deciding, that aboriginal title to the Arctic Slope was not legally extinguished prior to the Settlement Act.

III. CONGRESSIONAL INTENT IN SECTION 4 OF THE SETTLEMENT ACT

The pivot of this case is Section 4 of the Alaska Native Claims Settlement Act, the extinguishment provision. Section 4 of the Act, 43 U.S.C. § 1603, provides:

(a) All prior conveyance of public land and water areas in Alaska, or any interest therein, pursuant to Federal law, and all tentative approvals pursuant to section 6(g) of the Alaska Statehood Act, shall be regarded as an extinguishment of the aboriginal title thereto, if any.

(b) All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist, are hereby extinguished.

(c) All claims against the United States, the State, and all other persons that are based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska, or that are based on any statute or treaty of the United States relating to Native use and occupancy, or that are based on the laws of any other nation, including any such claims that are pending before any Federal or state court or the Indian Claims Commission, are hereby extinguished.

No dispute is raised as to the meaning of subsection 4(b). The parties agree that 4(b) resolved the question of existing land titles by extinguishing, as of December 18, 1971, any and all aboriginal title in Alaska. After that date, no Native group had aboriginal title or could claim aboriginal title to any land in Alaska.

■ Contentions as to interpretation and construction of subsection 4(a), however, differ sharply. According to plaintiffs and intervenors, 4(a) validated as of December 18, 1971, prior federal conveyances and tentative approvals of State land selections which were void when actually made. According to this interpretation, the State leases previously issued to various oil companies were not valid and all activities on lands covered by such leases were trespasses until the effective date of the Settlement Act.

Defendants, by contrast, contend that 4(a) validates the prior federal conveyances, including tentative approvals of State land selections, and operated to extinguish aboriginal title as of the date of the prior conveyance.

On examination of the language of the statute, the circumstances surrounding the enactment, and the pertinent legislative history, I conclude that the unmistakable intent of subsection 4(a) is not only to validate prior conveyances of public land in Alaska, including tentative approvals of State land selections under the Statehood Act, but to dispel any doubt that aboriginal title to such lands was extinguished at the time of tentative approval or conveyance.

The language of 4(a) tends to refute the contention that the provision was intended merely to recognize existing titles and leases as of the date of the Settlement Act without retroactively extinguishing aboriginal title. Instead of merely stating that prior conveyances are hereby validated, 4(a) specifically provides:

(a) all prior conveyances of public land . . . and all tentative approvals . . . shall be regarded as an *extinguishment of the aboriginal title* thereto, if any. (emphasis added)

The choice of the words employed in subsection 4(a) indicates Congress intended that

extinguishment relate back to the time of prior conveyance. Contrast the language of subsection 4(a) with subsections 4(b) and 4(c) which employ language indicative of the present tense. The choice of terms could not be accidental but reflects the intention of Congress that all prior conveyances of public land be recognized as passing title while at the same time extinguishing aboriginal title as of the date of the conveyance or approval of selection.

(b) all aboriginal titles, if any  .  .  . are *hereby* extinguished. (emphasis added)

(c) all claims  .  .  . based on claims of aboriginal right, title, use or occupancy  .  .  . are *hereby* extinguished. (emphasis added)

I conclude then that Congress chose the specific language used in subsection 4(a) by design. Congressional intent was to make clear that any prior grant of land under federal law or tentative approval under 6(g) of the Statehood Act operated to extinguish aboriginal title *at the time the conveyance was made or the approval given*. In short, Congress intended the conveyance or approval to be the operative fact extinguishing aboriginal title.

■ This construction. is consistent with and is supported by other provisions of the Settlement Act. Subsection 14(g), 43 U.S.C. § 1613(g), provides:

(g) all conveyances made pursuant to this Act shall be subject to valid existing rights. Where, prior to patent of any land or minerals under this Act, a lease, contract, permit, right-of-way, or easement (including a lease issued under section 6(g) of the Alaska Statehood Act) has been issued for the surface or minerals covered under such patent, the patent shall contain provisions making it subject to the lease, contract, permit, right-of-way, or easement, and the right of one lessee, contractee, permittee, or grantee to the complete enjoyment of all rights, privileges, and benefits thereby granted to him  .  .  . ..

Subsection 14(g) protects the rights and expectations of persons who previously received an interest in land pursuant to federal law. Plaintiffs' contention that these prior lessees, permittees, or grantees are liable for trespass for entries made prior to the effective date of the Settlement Act contravenes the express legislative purpose of fully protecting the rights of those who entered the North Slope in reliance on federal authorization.

Furthermore, the legislative history of the Settlement Act shows that Congress viewed the prior federal conveyances and State selections as effecting a taking of Native claimed lands for which compensation was being provided. Significantly, the legislative record makes numerous references to past takings of Native claimed land. For example, in the 1971 Senate Report, the Committee on Interior and Insular Affairs explains:

Under section 5(a), [of S. 35] the Federal Government is obligated to pay into the Alaska Native Compensation Fund $500 million over a 12-year period as compensation to the Natives for lands and interests in lands taken in the past to which their claims are extinguished by the Act. Senate Report No. 92–405, supra, at 105.

And Senate Bill 35 as reported by the Committee and passed by the Senate on November 1, 1971, made it clear that those "past takings" included conveyances to the State and third parties. Section 2 of S. 35, the Declaration of Policy, provided in pertinent part:

(3) a payment of $500,000,000 over a period of twelve years as compensation for lands taken in the past for Federal purposes or conveyed by patent or otherwise to the State of Alaska or to other third parties and for the extinguishment by this Act of all remaining claims or aboriginal rights;

(4) a right to receive a portion of the revenues from the leasing and sale of minerals on certain lands in Alaska, subject to the limitations of this Act, as compensation for lands taken in the past and for the extinguishment by this Act of all remaining aboriginal rights.  .  .  .

S. 35 printed in Sen. Report No. 92–405, 92nd Congress, 1st Session at p. 2.[51] Although this language was deleted from the Declaration of Policy when the House-Senate Conference Committee adopted the form of the House Bill in lieu of the Senate version, the change in wording does not indicate that Congress changed its belief that past conveyances effected a taking of aboriginal title.

■ Thus, the legislative history shows that Congress viewed previous federal conveyances of lands claimed by Alaska Natives as past takings of aboriginal title and that the Settlement Act was intended to compensate the Natives for these past appropriations as well as for the extinguishment of any remaining aboriginal land rights. The legislative history squarely contradicts the construction of Section 4 urged by the United States and the Inupiat Community.

Moreover, the circumstances surrounding the enactment of the Settlement Act support the conclusion that Congress intended to make the extinguishment of aboriginal title relate back to the date of tentative approval of State land selections. Native claims pending at the time the Settlement Act was passed challenged not only the State's title to the tentatively approved lands (and, therefore, questioned the validity of the oil leases executed by the State) but also raised a question as to the State's right to the more than $900 million which the State had received from the September, 1969, oil lease sale. The legislative record shows that Congress was well aware of the controversy:

The fact that unresolved Native claims have been made to most of the lands of Alaska has halted both federal mineral leasing and the transfer of lands selected by the State under the Statehood Act. Some contend that the Native land claims may also cast a cloud over the State's title to mineral revenues it has already received. . . . S.Rep. 92–405 at 73.

Congress addressed the problem in subsection 4(a). By providing that tentative approvals of State land selections extinguished any aboriginal title thereto, Congress affirmed the Secretary's authority to tentatively approve the State land selections pursuant to the Statehood Act and resolved all questions as to the validity of the State's right to the oil lease proceeds. Intervenor's interpretation of 4(a) as merely validating the State's title as of December 21, 1971, leaves unresolved the State's right to revenues received before December 21, 1971.

It is incomprehensible that Congress would fail to resolve in this legislation a question as important as the State's right to the more than $900 million in revenues derived from the 1969 sale of oil leases on State selected land in Prudhoe Bay.

Moreover, it is inconsistent with the fact that the Settlement Act requires the State to contribute a portion of its oil and mineral revenues to the Settlement fund. Under Section 9 of the Settlement Act, the Natives have the right to receive $500 million in revenues to be derived from mineral leases on public lands in Alaska, including lands tentatively approved to the State or selected by the State.[52] Thus, Congress has

**51.** Virtually identical provisions were contained in S. 1830 and its counterpart H.R. 10193, bills considered in 1969–70 by the 91st Congress. S. 1830 was passed by the Senate but the House failed to take action on it so S. 1830 was re-introduced in the 92nd Congress as S. 35.

The early bills introduced in 1967–68 in the 90th Congress authorized Alaska Natives to bring suit in the court of claims for compensation for lands taken. For example, the original proposal of the Alaska Federation of Natives to the 90th Congress, S. 2690, provided jurisdiction in the court of claims to award compensation at fair market value at the time of taking for all aboriginal title lands which had been

appropriated and to grant the Natives title to all aboriginal lands to which title had not previously been conveyed to third parties by the United States. No action was taken by either the House or the Senate Interior Committees and the bills were not re-introduced in the 91st Congress. See S.Rep.No.91–925, p. 91–94, for a detailed summary of the bills considered by the 90th Congress.

**52.** Section 9 of the Settlement Act, 43 U.S.C. § 1608, provides in pertinent part:

Revenue Sharing

(a) The provisions of this section shall apply to all minerals that are subject to disposi-

already determined that the State must pay a certain amount of its mineral revenues towards settlement of Native claims. The effect of the claims asserted against the State in this lawsuit would be to require the State to pay not only its designated share of the settlement but additionally to account for all benefits received from tentatively selected Arctic Slope land prior to the Settlement Act.

■ In short, the circumstances surrounding enactment of the Settlement Act and the legislative history confirm that 4(a) means exactly what it says—prior conveyances of land from the federal domain and tentative approvals of State land selections extinguished any aboriginal title to the selected or transferred lands. Subsection 4(a) thereby eliminates any basis for Native claims relating to pre-Settlement Act entries on land tentatively approved to the State or previously conveyed to private parties.

Subsection 4(a) so construed requires dismissal of claims for entries under State leases pursuant to subsection 6(g) of the Statehood Act or entries pursuant to valid federal leases or conveyances. The majority of the claims are in this category. However, plaintiffs additionally assert damage claims for unauthorized entries on the North Slope. These remaining claims draw subsection 4(c) of the Settlement Act into contention.

Subsection 4(c) extinguishes:

All claims against the United States, the State, and all other persons that are based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska, . . . .

Plaintiff and intervenor contend that the phrase "claims based on claims of aboriginal right . . ." means claims for compensation for taking Indian land, not trespass claims. It is argued that Congress did not intend to extinguish the trespass claims asserted in this lawsuit.

■ The language of subsection 4(c) is clear and unequivocal. It explicitly extinguishes *all* claims that are based on claims of aboriginal occupancy. Claims of past trespass to lands claimed by reason of aboriginal title require as an essential element

---

tion under the Mineral Leasing Act of 1920, as amended and supplemented.

(b) With respect to conditional leases and sales of minerals heretofore or hereafter made pursuant to section 6(g) of the Alaska Statehood Act, and with respect to mineral leases of the United States that are or may be subsumed by the State under section 6(h) of the Alaska Statehood Act, until such time as the provisions of subsection (c) become operative the State shall pay into the Alaska Native Fund from the royalties, rentals, and bonuses hereafter received by the State (1) a royalty of 2 per centum upon the gross value (as such gross value is determined for royalty purposes under such leases or sales) of such minerals produced or removed from such lands, and (2) 2 per centum of all rentals and bonuses under such leases or sales, excluding bonuses received by the State at the September 1969 sale of minerals from tentatively approved lands and excluding rentals received pursuant to such sale before the date of enactment of this Act. Such payment shall be made within sixty days from the date the revenues are received by the State.

(c) Each patent hereafter issued to the State under the Alaska Statehood Act, including a patent of lands heretofore selected and tentatively approved, shall reserve for the benefit of the Natives, and for payment into the Alaska Native Fund, (1) a royalty of 2 per centum upon the gross value (as such gross value is determined for royalty purposes under any disposition by the State) of the minerals thereafter produced or removed from such lands, and (2) 2 per centum of all revenues thereafter derived from the State from rentals and bonuses from the disposition of such minerals.

(d) All bonuses, rentals, and royalties received by the United States after the date of enactment of this Act from the disposition by it of such minerals in public lands in Alaska shall be distributed as provided in the Alaska Statehood Act, except that prior to calculating the shares of the State and the United States as set forth in such Act, (1) a royalty of 2 per centum upon the gross value of such minerals produced (as such gross value is determined for royalty purposes under the sale or lease), and (2) 2 per centum of all rentals and bonuses shall be deducted and paid into the Alaska Native Fund. The respective shares of the State and the United States shall be calculated on the remaining balance. . . .

of proof a showing of aboriginal use and occupancy at some time in the past. Such trespass claims are claims "based on claims of aboriginal occupancy" and fall within the scope of the plain language of subsection 4(c).[53]

■ Since subsection 4(c) specifically refers to claims against the State and all other persons, it plainly embraces claims beyond claims for appropriation of Indian land which are assertable only against the United States.

Given the plain and unambiguous meaning of the language of subsection 4(c), intervenor resorts to the legislative history in an effort to show that Congress did not intend in subsection 4(c) to extinguish trespass claims.

■ First, intervenor argues that the purpose of the Settlement Act was to clear title to Alaska land in order to permit development to proceed. Given this purpose, it is argued that Congress was not concerned with extinguishing damage claims for past trespasses because such trespass claims do not challenge present title. Certainly, the Settlement Act was intended to

remove the cloud on Alaska land titles but that is not its sole purpose. The legislative history demonstrates that the Congressional concern included avoiding costly litigation and ending divisiveness between Native and non-Native in Alaska. If Congress had simply intended to eliminate clouds on title, it could have stopped with subsections 4(a) and 4(b).

Second, intervenor argues that the origin of the language "all other persons" demonstrates that Congress did not intend by including this language to extinguish trespass claims against third parties. Intervenor observes that the extinguishment clause of S. 1830 was amended to include claims against the State and all other persons, in addition to claims against the United States, in response to the urgings of the Western Oil and Gas Association (WOGA) during the 1969 Senate Committee hearings on S. 1830. Intervenor argues that the purpose of WOGA in proposing the additional language, and the purpose of Congress in enacting it, was merely to preclude Native title claims against the oil companies. However, the WOGA statement[54] on

---

**53.** Of course, where individual Natives or a group of Natives have fee title or a leasehold interest in land, their claims of trespass to such land can be proven without a showing of aboriginal use or occupancy. Similarly, a claim of injury or loss of personal property does not depend on a showing of aboriginal title. Accordingly, such claims are not covered by subsection 4(c).

**54.** WOGA's statement to the Senate Interior Committee during hearings in April, 1969, on S. 1830 says in pertinent part:

It is obviously desirable for the legislation to effectuate a complete settlement and extinguishment of the Native claims. Loose ends and uncertainties should not be left for subsequent resolution, and no basis should remain for asserting any of those claims in the future against anyone. Achievement of this objective requires a careful and comprehensive description of the claims.

Section 3(a) of S. 1830 is a good beginning in this regard, but it should be improved in three respects:

*First.* The settlement should specifically extend, not only to the United States, but also to the State of Alaska and all other persons to whom the United States has granted, sold, or leased lands claimed by the

Natives. The Native claims are moral claims, not enforceable legal rights, to land. When lands claimed by the Natives are "taken" by the United States, either for its own use, or by transfer, sale, or lease to third parties, the Native claims to those lands are extinguished, and the Natives then have a moral claim to compensation for the loss. As the Federal Field Committee has pointed out, that claim, like the claim to the land itself, "is against the federal government." It is not against the third parties to whom the United States has transferred the lands or interests therein. Congress has unfettered discretion to deal with these moral claims, both for land and compensation, as it thinks best, but it is generally agreed that the Natives should be fairly compensated, both for the lands which have been previously taken, and for the remaining claims which will be extinguished by the legislation. That, of course, is a basic purpose of S. 1830 which will provide compensation for past takings and present extinguishment. The necessary effect of that will be to leave no basis for asserting the Native claims against the United States or anyone else. Nevertheless, we think it desirable to spell this out clearly in the legislation by providing that the settle-

which intervenor relies shows that WOGA was concerned with precluding Native claims arising from past activities of the oil companies on the North Slope. Thus, intervenor's interpretation of subsection 4(c) finds no support in this part of the legislative history.

■ Finally, in attempting to avoid the terms expressed in subsection 4(c), plaintiff and intervenor rely heavily on a comment in the 1971 Senate Report explaining the scope of the extinguishment provision. The pertinent part of Senate Report No. 92–405 states:

Subsection 4(a) declares that the provisions of this Act constitute a full and final extinguishment of any and all claims based upon aboriginal right, title, use or occupancy of land in Alaska. The language specifically includes submerged lands and any aboriginal hunting and fishing rights. The extinguishment is final and effective not only for claims against the United States but also for any claims against the State of Alaska and all other persons. Remaining in effect and unextinguished by this Act are all claims which are based upon grounds other than the loss of original Indian title land. Included in such unextinguished claims are suits for an accounting for funds belonging to Natives or Native groups in the custody of the United States, for tort or breach of contract, and for violations of the fair and honorable dealings clause of the Indian Claims Commission Act. Specifically included, and dismissed and extinguished under the terms of this Act, are all claims pending before the Indian Claims Commission and any court, Federal or State, which are based upon a claim of aboriginal right, title, use or occupancy. . . . Id. at 110.

Plaintiff's reliance on this somewhat ambiguous passage in the 1971 Senate Report is misplaced. The legislative history of the extinguishment provision of the Settlement Act clearly demonstrates that Congress intended to extinguish trespass claims based on aboriginal title.

First, reference to the 1969 Senate Committee hearings where former Justice Goldberg, attorney for the AFN, discussed with Senators Stevens and Metcalf the meaning and scope of the extinguishment clause in S. 1830 clearly show that the Senate Committee intended to distinguish between claims based on past Native use and occupancy of land on the one hand, and claims having nothing to do with aboriginal use and occupancy of land on the other hand. The former, including claims of traditional fishing rights, were extinguished. The latter, including, for instance, a claim that the United States breached the Fair and Honorable dealings clause by bombarding a Native village or a personal injury claim by a Native working for the federal government, were not extinguished.[55]

Second, the language in the 1971 Senate Report on which intervenor relies is actually descriptive of language which appeared in the 1970 Senate Bill but was deleted from the 1971 bill as reported by the Senate Committee. The extinguishment provision of S. 1830 as passed by the Senate in 1970 read as follows:

The provisions of this Act shall constitute a full and final settlement and extinguishment of any and all claims against the United States, the State and all other persons which are based upon aboriginal right, title, use, or occupancy of land in Alaska (including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist) by any Native, Native Village, or Native group or claims arising under the Act of May 17, 1884 (23 Stat. 321), or any other statute or treaty of the United States

ment extends to the United States and all other persons, which will include the State of Alaska, mineral lessees of the United States, and anyone else to whom the United States has granted any interest in lands claimed by

the Natives. There will then be no possibility of future dispute.

**55.** Hearings on S. 1830 before the Senate Commission on Interior and Insular Affairs, 91st Cong., 1st Session (1969), 298–301.

relating to Native use or occupancy of land, including all *land* claims (*but not claims based on grounds other than loss of original Indian title land*) pending before any court or the Indian Claims Commission on the effective date of this Act. S. 1830, 91st Cong., 2d Sess. § 4(a) (1970) (emphasis added).

No action was taken by the House that year, so the Senate bill was reintroduced in early 1971 with the extinguishment provision in the same form.[56] No change in the extinguishment provision of the 1971 Senate Bill was made until October, 1971. On September 28, 1971, the House Committee reported out a more broadly worded provision.[57] On October 5, 1971, the *Edwardsen* suit was filed. On October 21, the Senate Committee reported its bill with an extinguishment provision that had been changed to more closely approximate the House version. The revised Senate extinguishment provision omitted the word "land" before "claims" and eliminated the proviso excepting claims based on grounds other than loss of original Indian title land.[58] Although the 1971 Senate Committee Report fails to give any reason for the change, the chronology of events outlined above indicates that the Senate adopted the broader House language to better express the intent to effect a comprehensive settlement that extinguished all claims based on aboriginal land rights, including the *Edwardsen* trespass and accounting claims.[59] The Senate's awareness of the *Edwardsen* claims is evidenced by the specific reference to that case in the 1971 Senate Report.[60]

The conference committee adopted the House version of the extinguishment provision. However, there was no real substan-

---

**56.** S. 35, 92d Cong., 1st Sess. § 4(a) 1971.

**57.** H.R. 10367, as reported by the House Committee, contained the following extinguishment provisions:

SEC. 4. (a) All prior conveyances of public land and water areas in Alaska, or any interest therein, pursuant to Federal law shall be regarded as an extinguishment of the aboriginal title thereto, if any.

(b) All alleged aboriginal titles and claims of aboriginal title in Alaska based on use and occupancy, including any alleged aboriginal hunting and fishing rights that may exist, are hereby extinguished.

(c) All claims against the United States, the State, and all other persons that are based on alleged aboriginal right, title, use, or occupancy of land or water areas in Alaska, or that are based on any statute or treaty of the United States relating to Alaska Native use and occupancy, including any such claims that are pending before any court or the Indian Claims Commission, are hereby extinguished.

**58.** As reported, the provision had been changed to omit the following bracketed words and to added the underscored words:

The provisions of this Act shall constitute a full and final settlement and extinguishment of any and all claims against the United States, the State and all other persons which are based upon aboriginal right, title, use, occupancy of land in Alaska (including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist) by any Native, Native Village, or Na-

tive group or claims arising under the Act of May 17, 1884 (23 Stat. 24), or the Act of June 6, 1900 (31 Stat. 321), or any other statute or treaty of the United States relating to Native use or occupancy of land, including all [land] claims [(but not claims based on grounds other than loss of original Indian title land)] based upon aboriginal right, title, use or occupancy pending before any court or the Indian Claims Commission on the effective date of this Act. All prior conveyances of public land and water areas in Alaska, or any interests therein, pursuant to Federal law, including tentative approvals pursuant to section 6(g) of the Alaska Statehood Act, shall be regarded as an extinguishment of any and all Native claims thereto.

**59.** During the 1975 House hearings on proposed amendments to the Settlement Act, Senator Stevens, a member of the 1971 Senate Subcommittee on Interior and Insular Affairs, explained that the reporting of the broader extinguishment clause in the House bill in conjunction with the filing of *Edwardsen v. Morton* "caused us in the Senate to reconsider the language of our extinguishment provision, and we concluded that it should be broadened so as to leave no doubt that the settlement would be total . . .." 1975 House Hearings on H.R. 6644, Serial No. 94–20, at J 110.

**60.** Senate Rep. 92–405, 92nd Cong., 1st Sess. (1971), states: "In addition, litigation has in recent weeks been initiated by the Arctic North Slope Native Association against the State of Alaska over the title to Prudhoe Bay." Id. at 98.

tive difference between the final House and Senate extinguishment provisions.

The 1971 House Report states that Section 4 of the House Bill, which is virtually identical to Section 4 of the Settlement Act, "extinguishes all aboriginal titles in Alaska, and all claims based thereon." [61] The House Report further offers the following specific explanation of the extinguishment provision:

The section extinguishing aboriginal titles and claims based on aboriginal title is intended to be applied broadly, and to bar any further litigation based on such claims of title. The land and money grants contained in the bill are intended to be the total compensation for such extinguishment.[62]

Similarly, the joint House-Senate Conference report set forth the following explanation of the extinguishment provisions of the Settlement Act:

It is the clear and direct intent of the conference committee to extinguish *all* aboriginal claims and *all* aboriginal land titles, if any, of the Native people of Alaska and the language of settlement is to be broadly construed to eliminate such claims and titles as any basis for any form of direct or indirect challenge to land in Alaska. (emphasis original).[63]

■ The trespass claims asserted in this lawsuit are an indirect challenge to land ownership in Alaska. It was the express intention of the Conference Committee to eliminate such indirect challenges to title.

■ Thus, Congress has expressly directed that the language of the Settlement Act be broadly construed to effectuate a comprehensive settlement of all Native claims based on aboriginal use and occupancy of land in Alaska and to bar any litigation based on such claims.

Broadly construing the clear language of subsection 4(c) of the Settlement Act leaves no doubt that Congress intended to extinguish and did extinguish Native claims against the State of Alaska and private parties for trespass on aboriginal title lands prior to passage of the Settlement Act.

To summarize, I hold that subsection 4(a) extinguishes aboriginal title to lands tentatively approved to the State or conveyed pursuant to federal law as of the date of the tentative approval or conveyance.

Subsection 4(b) extinguishes all remaining aboriginal title and Native claims to land as of December 18, 1971.

Subsection 4(c) goes beyond extinguishment of claims for compensation for the taking of Indian land and extinguishes all Native claims based on alleged aboriginal occupancy, including claims against private parties for past trespasses.

## IV. THE SETTLEMENT ACT'S EXTINGUISHMENT OF TRESPASS CLAIMS IS CONSTITUTIONAL

■ Intervenor contends that claims of trespass to aboriginal possession are protected property interests within the meaning of the Fifth Amendment.[64] It is argued that Congress lacks power to cut off the rights of the Natives to seek judicial relief for third party interference with their possessory rights. Indeed, the *Edwardsen* court's concern that Congress might lack power to extinguish accrued trespass claims led that court to construe the Settlement Act as not affecting accrued trespass claims.[65]

My examination of relevant authorities leads me to conclude that trespass claims based on unrecognized aboriginal title are not protected property interests and, there-

---

**61.** House Report No. 92–523 at 8, 1971 U.S. Code Congressional and Administrative News at p. 2196.

**62.** Id. at p. 2198.

**63.** Conference Report No. 92–746, 40; Vol. 2, 1971 U.S. Code Congressional and Administrative News at p. 2196, 2253.

**64.** The United States does not suggest that Congress had no power to extinguish accrued trespass claims but contends that Congress did not intend to do so in the Settlement Act.

**65.** *Edwardsen v. Morton*, supra, 369 F.Supp. at 1379.

fore, the Settlement Act's extinguishment of Native trespass claims against third parties presents no constitutional problem.

In *Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955), the Supreme Court determined the nature of the rights of Alaska Natives in lands claimed on the basis of aboriginal use and occupancy.

After concluding that Congress had not recognized the title of the Tee-Hit-Ton Indians to the lands they occupied, the Supreme Court held:

> [Unrecognized aboriginal title] is not a property right but amounts to a right of occupancy which the sovereign grants and protects against intrusion by third parties but which right of occupation may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians. 348 U.S. at 279, 75 S.Ct. at 317.

> \* \* \* \* \* \*

> . . . Indian occupation of land without government recognition of ownership creates no rights against taking or extinction by the United States protected by the Fifth Amendment or any other principle of law. 348 U.S. at 285, 75 S.Ct. at 320.

The Court also addressed the concept of aboriginal title in an earlier case, *United States v. Santa Fe Pacific R. Co.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941). *Santa Fe* was a suit brought by the United States on behalf of the Walapai Tribe of Arizona to enjoin the Santa Fe Railroad from using certain land claimed by the Walapai by right of aboriginal occupancy and for an accounting of all rents and profits derived by the railroad from past use of the land in question. The Court explained aboriginal title thusly:

> Unquestionably it has been the policy of the Federal Government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States. 314 U.S. at 345, 62 S.Ct. at 251.

This policy of respecting Indian occupancy rights was "founded on the desire to maintain just and peaceable relations with the Indians." 314 U.S. at 346, 62 S.Ct. at 251.

■ *Tee-Hit-Ton* makes clear that Indian occupancy of land without government recognition of ownership is not a constitutionally protected interest and therefore may be terminated by Congress at will without compensation. It follows that a claim of past interference with aboriginal use and occupancy is not a property interest and therefore such claim may also be terminated by Congress at will without compensation. Since the underlying interest (Indian use and occupancy) is not constitutionally protected, trespass or other claims of interference with the underlying interest likewise fall outside of constitutional protection.

This is not to say that Indians might never invoke judicial remedies in defense of a right of possession based on aboriginal use and occupancy. It would seem that in order to effectuate the United States' policy of protecting Indian occupancy against third party intrusion, Indians ought to have access to the courts to protect possessory rights.[66] We are not now presented with

**66.** *Edwardsen v. Morton,* 369 F.Supp. 1359 (D.D.C.1973) held that a claim of unrecognized aboriginal occupancy is sufficient to support a trespass claim against third parties. *Edwardsen,* however, was not an action by Indians against third parties. Limited to its facts, *Edwardsen* actually holds that the Eskimo plaintiffs had a cause of action against the defendant federal officials grounded on breach of the government's fiduciary duty to protect Native occupancy from third party intrusion. In cases where third parties have been sued for trespass to Indian land, the basis of the Indians' claim to land was more than mere unrecognized aboriginal title. For example, in *United States v. Southern Pacific Transportation Co.,* 543 F.2d 676 (9th Cir. 1976), the occupancy rights of the Walker River Paiute Tribe of Nevada (who sued in their own behalf in a companion case consolidated on appeal) were recognized in an Executive Order Reservation. Similarly, in *United States v. Santa Fe Pacific R. Co.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941), the Walapai Tribe had an executive order reservation at the time of suit. The tribe's trespass claims were upheld as to aboriginal lands with-

that precise issue. Here, Congress has expressly extinguished any aboriginal possessory rights which the Alaska Natives may have had and all claims based on such possession, including damage claims for past interference with aboriginal use and occupancy. The question is whether Congress has the power to validate prior entries as it did in subsection 4(a) or to extinguish all aboriginal claims challenging such entries as it did in subsection 4(c) of the Settlement Act.

 Intervenor in effect challenges the powers of Congress to retroactively extinguish aboriginal title and claims for pre-1971 entries on the North Slope. This challenge must fail. *Tee-Hit-Ton* and *Sante Fe* establish that Congress has plenary power over aboriginal use and occupancy and claims derived therefrom and may extinguish such occupancy rights and derivative claims in any manner it chooses.[67]

Indeed, it is essential that Congress be able to extinguish aboriginal title and all claims based on aboriginal title unimpeded by constitutional restrictions so that Indian land claims and the disputes generated by such claims may be conclusively and finally settled.

To hold, as intervenor urges, that Congress lacked the power to extinguish claims against the United States, the State and third parties for trespass to aboriginal lands in Alaska would mean that Congress is powerless to effect a final and comprehensive solution to the Native land claims problem in Alaska. It would mean the Settlement Act is illusory. The fact that Alaskan Natives petitioned Congress for a just and final settlement of their claims contradicts the claim now made that Congress was in fact limited in its authority to effect a final settlement.

On the authorities discussed, I conclude that Congress does have the power to effect

a comprehensive and final settlement of the Native land claims issue by extinguishing all claims relating to aboriginal use and occupancy of land, including claims for past trespasses to Native occupied land. Section 4 of the Settlement Act in its entirety is constitutional.

## V. CONCLUSION

The Settlement Act settled and extinguished *all* claims based on aboriginal title, use, and occupancy. Congress meant to settle such disputes, was empowered by the Constitution to settle them, and did settle them.

Accordingly, defendants' motion to dismiss all claims for tortious interference with Natives use and occupancy of lands in Alaska is granted.

---

in the reservation but were dismissed as to lands outside the reservation.

67. Courts have affirmed the power of Congress to validate prior entries on aboriginal land and thereby retroactively extinguish aboriginal title

and claims arising from those entries. *United States v. Northern Paiute Nation*, 490 F.2d 954, 203 Ct.Cl. 468 (1974); *Shoshone Tribe of Indians v. United States*, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937).